COMMONWEALTH vs. ARTHUR J. CINELLI
(and seven companion cases[1]).

Middlesex. December 9, 1982. — May 16, 1983.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Robbery. Practice, Criminal,* New trial, Dismissal, Discovery. *Identification. Constitutional Law,* Assistance of counsel, Conduct of government agents, Search and seizure, Waiver of constitutional rights. *Waiver. Probable Cause.*

Evidence at the trial of indictments charging armed robbery and other serious crimes was sufficient to warrant submission of the cases to the jury despite a defendant's claim that the Commonwealth had failed to produce a witness who would definitely identify him as the driver of the assailants' vehicle. [203-204]

A judge did not abuse his discretion in denying a criminal defendant's motion for a new trial, based on the contention that verdicts of guilty of armed robbery and other serious crimes were against the weight of the evidence, where certain alibi testimony which the defendant claimed the jury had "irrationally" disregarded contained inconsistencies and was unpersuasive. [204-205]

A judge's order compelling a criminal defendant to shave his beard and to appear in a pretrial court-supervised lineup was not such a suggestive procedure as to violate the due process clause of the Fourteenth Amendment to the United States Constitution where evidence before the judge entitled him to conclude that the defendant, if bearded, had only a slight beard at the time of the crime. [205-207]

Although police officers acted improperly in conducting a post-arraignment interview of a defendant at a house of correction when they had reason to know he was represented by counsel and after he suggested that counsel should be present, their conduct did not require dismissal of indictments against the defendant where the circumstances did not show that the police had acted with deliberateness and calculation to subvert the attorney-client relationship or that the interview had resulted in prejudice to the defendant. [207-211]

---

[1] There were three indictments against Cinelli and four indictments against codefendant Rocco Costa.

Evidence at a hearing on a motion to suppress statements made by a crim-
inal defendant warranted findings that he had been properly advised
of his Miranda rights and possessed sufficient mental capacity to waive
them. [212]

Where an affidavit in support of a search warrant for certain premises
recited facts establishing probable cause to believe that a named per-
son who resided on the premises had committed a robbery and that
certain ammunition was connected with the crime, a police search of
the premises pursuant to the warrant and their seizure of ammunition
found there was lawful. [212-214]

There was no merit to the contention of criminal defendants that the
Commonwealth's failure to provide them with an "anonymous tips"
file, compiled by a police department, denied them due process of law,
where the information contained in the file could not have aided them
significantly. [214-215]

INDICTMENTS found and returned in the Superior Court
Department on May 19, 1981.

A pretrial motion to compel the defendant Costa to par-
ticipate in a lineup was heard by *Kelley*, J., and a motion by
the defendant Cinelli to dismiss the indictments was heard
by *Connolly*, J. The cases were tried before *Urbano*, J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Edward J. McCormick, III*, for Arthur J. Cinelli.

*James S. Gallagher* for Rocco Costa.

*Carmel A. J. Motherway*, Assistant District Attorney, for
the Commonwealth.

*Thomas G. Shapiro*, for Massachusetts Association of Crim-
inal Defense Lawyers, amicus curiae, submitted a brief.

LIACOS, J. The defendants were convicted by a jury on
October 21, 1981, of armed robbery, armed assault with in-
tent to murder, unlawful carrying of a firearm,[2] and assault
and battery with a dangerous weapon. The convictions
arise out of the armed robbery and shooting of Sergeant
Richard McGlynn, a Medford police officer, on May 2,
1981, outside the offices of BayBank/Middlesex on Mystic
Avenue in Medford. The defendant Cinelli received a sen-
tence of from twenty to twenty-five years at the Massachu-

---

[2] Costa was convicted of unlawfully carrying a firearm in a motor vehicle.

setts Correctional Institution at Walpole for armed robbery and concurrent sentences on the remaining indictments. The defendant Costa received a sentence of from eight to twelve years for armed robbery and concurrent sentences on the remaining indictments. The defendants appealed, and we granted Cinelli's application for direct appellate review.

Costa claims error in that (1) the trial judge denied his motions for required findings of not guilty and for relief under Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), and that (2) a motion judge of the Superior Court ordered him to shave his beard in preparation for a court supervised lineup. Cinelli claims error in that (1) the indictments should have been dismissed under our decision in *Commonwealth* v. *Manning*, 373 Mass. 438 (1977), (2) certain statements he made to the police should have been suppressed, and (3) certain property seized during a search of his home under a search warrant should have been suppressed.[3] Both defendants also argue that the Commonwealth's refusal to disclose certain evidence violated the mandates of *Brady* v. *Maryland*, 373 U.S. 83 (1963). We affirm the convictions.

1. *Evidence.* There was evidence of the following facts. Shortly after 6 P.M. on May 2, 1981, McGlynn, carrying two night deposit bags containing more than $20,000 in cash and checks, proceeded to the office of BayBank/Middlesex on Mystic Avenue, Medford, and parked his vehicle near the night depository. As he inserted the key into the night depository, an automobile carrying two men drove up behind him. The passenger displayed a handgun and demanded the deposit bags. McGlynn reached for his service revolver. Shots were fired, and McGlynn was struck twice. The passenger seized the bags and got back inside the auto-

---

[3] Cinelli failed to include in the record copies of the findings and rulings of the judge on the motions to suppress, as well as a copy of the application for the search warrant which he claims to be insufficient to establish probable cause to search his home. See Mass. R. A. P. 18 (a), as amended, 378 Mass. 925 (1979). We have, however, obtained copies of these documents as part of our review of the issues raised. See Mass. R. A. P. 8 (a), as appearing in 378 Mass. 924 (1979).

mobile. Several more shots were exchanged.[4] The assailants then drove off toward the intersection of Harvard and Mystic Avenues. They abandoned the vehicle one-half mile from the bank. It was later determined that the automobile used by the assailants had been stolen from the Beachmont MBTA station in Revere, several miles from the residences of the defendants.

On May 2, 1981, Robin Mullen and several friends, Teresa Rago, Maria Rago, Carla Pagliucia, George Ferraira, Jr., and Stephen Taglieri were gathered at Mullen's house at 15 Bennett Street in Medford. At approximately 4 P.M., Costa telephoned the house. Teresa Rago volunteered to escort Cinelli and him from the nearby parking lot of Grossman's Lumber to the Mullen house. Teresa drove to the lot and found the defendants seated in a black Fiat automobile facing the BayBank/Middlesex office on Mystic Avenue. Teresa signaled to them, and they followed her to Mullen's house.

After the arrival of the defendants, some members of the group watched various television shows, the last of which commenced at 6 P.M. At some point, the defendants left. They arrived together at the Royal Auto Body Shop in Malden between 6:30 P.M. and 6:45 P.M.

The Commonwealth presented three witnesses, Teresa Rago, Carla Pagliucia, and Robin Mullen, who testified that the defendants left the house at about 6 P.M. They testified that Costa was then wearing mirrored sunglasses and a dungaree jacket with the collar turned up and had a beard of some sort.

The victim, McGlynn, testified that, while he did not have an opportunity to observe the driver of the automobile, he had a clear view of the passenger. He described the passenger as a well built male, approximately twenty-one years old, with a full face, wearing a light colored "scally"

---

[4] Expert testimony established at trial that two guns in addition to McGlynn's gun had been fired.

cap. He testified that he was "[a]bsolutely certain" that Cinelli was that man.[5]

Two other witnesses also identified Cinelli as the passenger. Janice Gaudet testified that, while she was stopped at the intersection of Harvard and Mystic Avenues at about the time of the robbery, the assailants' vehicle veered within a few feet of her vehicle at a speed of fifty to sixty miles an hour. Gaudet identified Cinelli as the passenger, with 70 % certainty.[6] She also described the driver and stated that the driver was wearing mirrored sunglasses and a jacket "zipped all the way up." She could not make an identification at trial. While she stated that Costa resembled the driver, she testified that she would rule him out if it were shown that he had a beard on May 2.

Another witness, Kevin Poirear, said that he had an opportunity to observe the assailants briefly as their automobile raced through the intersection of Harvard and Mystic Avenues. He testified that the driver had black hair, olive complexion, a clean shaven face, and was not wearing sunglasses. Poirear identified Costa as the driver, but stated later that he would disqualify Costa as a suspect if it were shown that Costa had a full black beard on May 2. Poirear also testified that he caught a fleeting glimpse of the passenger and identified Cinelli as the passenger.[7]

The Commonwealth also introduced evidence of certain incriminating statements made by Costa. Teresa Rago testified, and Costa admitted, that on May 10, 1981, Costa was angry that she had told other persons that he and Cinelli were in Medford together at 6 P.M. Louise Marini, Costa's girl friend at the time of the robbery, testified that

---

[5] McGlynn is a police officer with twenty-three years of experience and is a trained operator of Identikits used for purposes of preparing composites.

[6] Gaudet also picked Cinelli out of a pretrial court supervised lineup with the same degree of certainty.

[7] At a court supervised lineup, Poirear first identified Cinelli as the driver of the automobile. He later decided that Cinelli was the passenger, and he amended his identification accordingly.

Costa expressed concern that he would be arrested and stated that the eyeglasses in a composite published in a newspaper could have been sunglasses.

The Commonwealth also introduced in evidence statements made by the defendants to the police at the time of their respective arrests. Lieutenant Leo A. Sacco of the Medford police department testified that Cinelli stated that, while he had been with Costa at the Royal Auto Body Shop earlier in the day, he was with Judith Luciano at the time of the robbery. John Brady, a Medford police officer, testified that Costa first denied being in Medford on May 2.[8] Brady also testified that, after he identified himself, Costa stated, "You're McGlynn's partner. If you want to kill me, I know where you're coming from."

The defendants sought to establish a defense of alibi. Costa testified that he and Cinelli met Teresa Rago in the Grossman's Lumber parking lot across from the BayBank/ Middlesex office and proceeded to Mullen's house. He stated that they left shortly after 5 p.m. and went directly to Costa's house in Revere, arriving at 5:30 p.m. Although it appeared that it was about to rain, he said that they washed Cinelli's automobile. They then departed for the Royal Auto Body Shop at approximately 6:10 p.m. Costa stated that he was with Cinelli from 4 p.m. to 7 p.m. on May 2. Cinelli did not testify.

Several witnesses corroborated Costa's testimony. Stephen Taglieri testified that two men who resembled the defendants arrived at Mullen's house some time in the afternoon and left around 5 p.m. George Ferraira testified that two men who may or may not have resembled the defendants arrived at Mullen's house and left at approximately 5 p.m. He stated that he departed with Taglieri at about 6 p.m.

Three witnesses also testified that the defendants were outside Costa's house in Revere washing Cinelli's Fiat automobile at 5:30 p.m. on May 2. Robert C. Anderson, Jr., testi-

---

[8] Costa later gave a contradictory statement describing his whereabouts on May 2.

fied that he looked out of his window and saw the defendants washing the automobile. He recalled the weather as being clear and sunny with some clouds at the time. Frank Bramante testified that he talked with the defendants while they were washing the automobile. He stated that it appeared it was going to rain. Lucille Bramante testified that she heard her husband talking with Costa at 5:45 P.M. Costa's grandmother also testified that on May 2 the defendants arrived at her house in Revere between 5:15 and 5:20 P.M. and then washed the automobile. She stated that they left the house at 6:10 P.M.

2. *Sufficiency of the evidence.* Costa argues that the judge erred by not entering required findings of not guilty. In reviewing the propriety of the denial of a motion for required findings of not guilty, we examine the record to determine whether the evidence, read in a light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of each element of the crimes beyond a reasonable doubt. *Commonwealth* v. *Hill*, 387 Mass. 619, 623-624 (1982). *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979).

Essentially, Costa contends that the failure of the Commonwealth to produce a witness who would definitely identify him as the driver of the assailants' vehicle rendered its case defective.[9] We conclude, however, that the Commonwealth produced ample evidence indicating that Costa participated in the robbery. It is undisputed that, two hours before the robbery, the defendants were parked across from the BayBank/Middlesex office, and had an opportunity to plan their deeds. Three witnesses testified that the defendants left Mullen's house together a short time before the crime. The house is only a short distance from the BayBank/Middlesex office. The fate of the two defendants was

---

[9] Costa's argument appears to be that circumstantial evidence is not sufficient to establish guilt beyond a reasonable doubt. We have held to the contrary. *Commonwealth* v. *Smith*, 368 Mass. 126, 128-129 (1975). *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 54-56 (1975).

inextricably tied together by the evidence presented at trial. The fact that they were together at all relevant times is the one thing on which both the Commonwealth and the defendants agree. Either they were both in Revere, or they were both in Medford. Given these circumstances, the testimony of three witnesses identifying Cinelli as one of the assailants was most damaging to Costa's cause. Thus, the testimony, particularly McGlynn's, identifying Cinelli created a persuasive inference that the second assailant was indeed Costa. Further, Poirear did identify Costa as the driver and testified that certain features of the driver matched those of Costa.

Costa relies on the testimony of Gaudet and Poirear to the effect that, if it were shown that Costa had a beard on May 2, they would eliminate him as a suspect. We agree with Costa's view that the evidence indicated that he had a beard of some sort on May 2. But that fact did not significantly undercut the Commonwealth's case. A jury may accept, or reject, the testimony of a witness in whole, or in part. *Commonwealth* v. *Hill, supra* at 624. *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 411 (1978). Even if the jury were inclined to credit the entire testimony of Gaudet and Poirear, there is still the matter of their identification of Cinelli. There was testimony that Costa had only a "slight" beard on May 2, which would serve to validate Poirear's identification and explain why Gaudet and Poirear did not see a beard on the driver. In short, the evidence was sufficient to submit to the jury for their determination. There was no error.

3. *Motion for relief under Mass. R. Crim. P. 25 (b) (2).* Costa also argues that the judge erred by denying his motion for relief under Mass. R. Crim. P. 25 (b) (2). We have said that whether a motion for a new trial based on the weight of the evidence should be granted is a matter left to the sound discretion of the trial judge. *Commonwealth* v. *Woods*, 382 Mass. 1, 8 (1980). Accord *Commonwealth* v. *Gaulden*, 383 Mass. 543, 557 (1981). While it is our duty to determine whether the trial judge abused his discretion, "it has

repeatedly been stated that occasions when this court can do so' — set aside the action of the trial judge in refusing a new trial — 'are exceedingly rare.' *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 61 (1948)." *Commonwealth* v. *Woods, supra.*

We have already concluded that the Commonwealth presented sufficient evidence to take its case to the jury. But, Costa argues, the jury "irrationally" disregarded the testimony of the alibi witnesses. The weight of that testimony turns on an assessment of the witnesses' credibility, and the trial judge who heard the testimony and saw the witnesses is in the best position to make the assessment whether the verdicts of the jury were warranted. Further, our own assessment of the transcript indicates that the weight of the evidence supported the verdicts. The testimony of the alibi witnesses was not entirely persuasive and contained inconsistencies that could have been considered by the jury. There was no error. [10]

4. *Propriety of order requiring Costa to shave his beard.* Costa next challenges an order of a motion judge compelling him to shave his beard and to appear in a pretrial court supervised lineup. The motion judge issued the order on June 18, 1981, after a hearing. [11] The order provided that Costa could shave his beard two or three days before the lineup. The lineup was held on July 9, 1981, and was videotaped. During trial, a videotape of the lineup was introduced in evidence, and Poirear testified that he had identified Costa during the lineup.

The issue before us is a narrow one. Costa concedes that the motion judge's order did not violate his privilege against self-incrimination. See *United States* v. *Wade*, 388 U.S. 218, 222 (1967). He also concedes that any constitutional right to maintain his own chosen appearance, see *Calbillo*

---

[10] The Commonwealth produced a significant amount of additional credible evidence against the defendants, in addition to that which we have summarized in this opinion.

[11] Costa had been arraigned and had been admitted to bail at this time.

v. *San Jacinto Junior College*, 305 F. Supp. 857, 862 (S.D. Tex. 1969), may be curtailed if the Commonwealth produced evidence indicating that he did not have a full beard on the day of the crime. He argues, however, that the evidence before the motion judge demonstrated conclusively that he had a full beard on May 2 and, consequently, the order was not justified and resulted in an impermissibly suggestive lineup in violation of the due process clause of the Fourteenth Amendment to the United States Constitution.

The motion judge had before him a description of the assailants. He also received a number of affidavits stating that Costa was bearded on or about May 2 and a photograph of Costa taken on May 17, 1981, that showed him with a beard. The judge stated that he believed that Costa's appearance on May 17 did not preclude the possibility that he had grown the beard between May 2 and May 17. The judge was entitled to conclude that Costa, if bearded, had only a slight beard at the time of the crime.

A substantial body of law exists upholding the power of the State to compel a criminal defendant to alter his appearance and to shave a beard prior to a lineup. *United States* v. *Lamb*, 575 F.2d 1310, 1316 (10th Cir.), cert. denied sub nom. *Clary* v. *United States*, 439 U.S. 854 (1978). *United States* v. *Crouch*, 478 F. Supp. 867, 869 (E.D. Cal. 1979). *United States* v. *O'Neal*, 349 F. Supp. 572, 572-573 (N.D. Ohio 1972). *People* v. *Strauss*, 174 Misc. 881 (N.Y. Kings County Ct. 1940). Accord *United States* v. *Hammond*, 419 F.2d 166, 168 (4th Cir. 1969), cert. denied, 397 U.S. 1068 (1970); *Andrews* v. *State*, 291 Md. 622 (1981). While the prosecution in these cases made a stronger showing that the defendant had altered his appearance to avoid identification, the evidence before the motion judge was sufficient to show, at least at that preliminary stage of the proceedings, that Costa could have been relatively clean shaven on May 2.[12] Requiring a

_____

[12] We think that if Costa had been arrested the day after the crime and had a full beard, there would be no basis for the motion judge's order.

Costa argues that the evidence introduced at trial definitely demonstrated that he had a full black beard on May 2, 1981. That evidence,

defendant to alter his appearance to conform with the description of the perpetrator has not been held to be such a suggestive procedure as to violate the due process clause of the Fourteenth Amendment. See *United States* v. *Wade, supra*; *United States* v. *Satterfield,* 572 F.2d 687, 689-690 (9th Cir.), cert. denied, 439 U. S. 840 (1978); *United States* v. *Hammond, supra.* The record before the motion judge did not establish that the lineup would be unduly suggestive. *Commonwealth* v. *Correia,* 381 Mass. 65, 77-81 (1980). There was no error.

5. *Right to counsel.* Cinelli claims error in the denial of his motion to dismiss the indictments against him. He argues that a postarraignment interview conducted at the Billerica house of correction by two detectives constituted a wilful interference with his constitutional right to counsel and to a fair trial. He asserts that the appropriate remedy is dismissal of the indictments.

The facts, as found by the Superior Court judge who heard the motion, are as follows. On May 12, 1981, Detective Michael Cutillo of the Revere police department, received a telephone call from an unidentified man who stated that Cinelli, who was incarcerated in an isolation section of the Billerica house of correction, wished to speak with him. Cutillo was acquainted with Cinelli, but he had only a minor role in the investigation of the robbery. Cutillo and his partner, Officer Robert Nunez, proceeded to Billerica and requested to speak with Cinelli.

A guard notified Cinelli and informed him of his right to either to refuse to speak with the detectives or to have his lawyer present. After signing a waiver form, Cinelli spoke to the detectives privately. The detectives told Cinelli that the Commonwealth's case appeared to be strong, that no lawyer would be able to help him, that he could spend one year in jail awaiting trial, that he would benefit by cooper-

---

however, was not before the motion judge, and we do not consider it. The motion judge acted reasonably on the evidence before him at the time he issued the order pertaining to the lineup.

ating with the police, and that he could be sentenced to life imprisonment if convicted. They also urged Cinelli to provide them with any information which would establish his innocence. Cinelli steadfastly maintained his innocence, stated that he had an alibi, and asserted that he had friends on the street who were trying to discover who committed the robbery. At Cinelli's request, the detectives permitted Cinelli, in their presence, to place a telephone call to those friends. Cinelli made a telephone call and talked with two individuals whom he identified as Thomas Lightbody and Rocco Costa. Cinelli advised Lightbody and Costa that they should feel free to speak with Cutillo if they so desired.

The detectives admitted that their purpose was to secure Cinelli's cooperation. The judge found that the detectives had reason to believe that Cinelli was represented by counsel. He found further that Cinelli had asked, during the course of the interview, where his lawyer was and had suggested that his lawyer should be present. The detectives made no effort to identify and locate Cinelli's lawyer.

In *Commonwealth* v. *Manning,* 373 Mass. 438 (1977), we dismissed the indictment against Manning because government agents engaged in a deliberate and intentional attack on the relationship between Manning and his counsel in a calculated attempt to coerce him into abandoning his defense. *Id.* at 443-445. During two telephone conversations with Manning, government agents had made disparaging remarks concerning Manning's counsel and the manner in which counsel was conducting Manning's defense, and indicated that the tactics of defense counsel would not ensure that Manning would stay out of jail. *Id.* at 440. We read the trial judge's findings in that case as indicating that Manning's relationship with his counsel had been impaired to some extent and refused to apply the harmless error rule. *Id.* at 443. We found it unnecessary, however, "to formulate a per se rule which would mandate the dismissal of an indictment in cases in which government agents intentionally attempt to subvert the attorney-client relationship and the defendant's right to a fair trial." *Id.* at 444.

The motion judge correctly found that the detectives acted in an improper manner.[13] They had reason to know that Cinelli was represented by counsel. They continued to speak with Cinelli even after he suggested that his counsel should be present. Further, their remarks concerning the length of time Cinelli would spend in jail awaiting trial, the strength of the Commonwealth's case, and the length of a potential sentence were clearly improper. The question, however, is whether their conduct was sufficiently deliberate and egregious to require the dismissal of the indictments against Cinelli.

Cinelli argues, in reliance on *Manning*, that we should require the indictments to be dismissed even in the absence of any impairment of the attorney-client relationship or other prejudice to him.[14] We do not think *Manning* reaches that

---

[13] The judge found: "While the detectives proceeded to the Billerica House of Corrections under the mistaken, but good faith belief that the defendant wished to see them, the detectives appeared to have taken unfair advantage of their visit even though it never became clear the defendant had not instigated the meeting. In an effort to secure the co-operation of the defendant in the ongoing investigation of the Medford robbery, police overzealousness gave way to impropriety. The court considers the detectives' comments regarding the strength of the Commonwealth's case against the defendant, the length of time possible before the defendant's trial date, and the suggestion that the defendant could receive a life sentence if convicted wholly inappropriate."

[14] Our discussion here is relevant solely to whether prejudice is necessary to warrant the dismissal of an indictment under art. 12 of the Massachusetts Declaration of Rights. In *United States* v. *Morrison*, 449 U.S. 361, 365 (1981), the United States Supreme Court held that there is no basis for dismissing an indictment under the Sixth Amendment in the absence of demonstrable prejudice or a substantial threat thereof even if the violation is deliberate. We read *Morrison* as settling the Federal constitutional issue. We also note that there is authority for the proposition that no violation of the Sixth Amendment occurs unless the prosecution benefits in some way from the intrusion on the attorney-client relationship. *United States* v. *Davis*, 646 F.2d 1298, 1303 (8th Cir.), cert. denied, 454 U.S. 868 (1981). *Mastrian* v. *McManus*, 554 F.2d 813, 821 (8th Cir.), cert. denied sub nom. *Mastrian* v. *Wood*, 433 U.S. 913 (1977). *Morrison* did not address the point. *United States* v. *Morrison, supra* at 364 (Court assumed the Sixth Amendment was violated). We will assume that the detectives' conduct violated both the Sixth Amendment and art. 12.

far.   Our rejection of the harmless error rule in the circumstances of that case turned on the difficulty and dangers of engaging in precise calculations as to the amount of prejudice suffered.   In this case there is no showing of any prejudice whatsoever.

Dismissal of indictments is a drastic remedy for official misconduct.   In cases where we have not required a defendant to demonstrate prejudice, we permitted the Commonwealth to retry the defendant.   See *Commonwealth v. Hodge*, 386 Mass. 165, 167-168 (1982); *Commonwealth v. A Juvenile (No. 2)*, 384 Mass. 390, 392-394 (1981); *Commonwealth v. Tabor*, 376 Mass. 811, 819-820 (1978); *Commonwealth v. Johnson*, 365 Mass. 534, 547-548 (1974). Absent egregious misconduct or at least a serious threat of prejudice, the remedy of dismissal infringes too severely on the public interest in bringing guilty persons to justice. Cf. *Pisa v. Commonwealth*, 378 Mass. 724, 729-731 (1979); *Commonwealth v. Sires*, 370 Mass. 541, 545-546 (1976).

We do not see the need in this case to formulate a broad prophylactic rule.   While the conduct of the detectives was improper, we do not find here the degree of deliberateness and calculation which was present in *Manning*.   The matter here was a single incident.   Cinelli voluntarily had signed a waiver form consenting to the interview.   The detectives were not actively involved in the investigation and did not disparage Cinelli's attorney.   In many respects, their remarks accurately reflected Cinelli's position.   In these circumstances, we choose not to adopt a per se rule.

Cinelli's second argument is that the motion judge's finding that he did not suffer prejudice is erroneous.   Cinelli argues that the facts here are indistinguishable from those in *Manning* in that the conduct of the detectives irreparably impaired the attorney-client relationship at least to some extent.   Our prior discussion of this matter is, we think, largely dispositive of this claim.   See *United States v. Glover*, 596 F.2d 857, 861-864 (9th Cir.), cert. denied, 444 U.S. 860 (1979) (interview by government agents conducted without the permission of counsel which yielded no incriminating

statement or evidence did not warrant the remedy of dismissal). The court in *Glover* distinguished *Manning*, stating that "[t]he most damaging interference with the attorney-client relationship there was the impression the DEA agents attempted to convey that the defendant's counsel was incompetent. The effects of disparaging comments about counsel, particularly when coupled with a warning that reliance on counsel's judgment will not keep the defendant out of jail, can be detrimental to the attorney-client relationship and are not easily dispelled. Under such circumstances, a defendant may be deprived of the right to counsel." *Id.* at 861. Cf. *United States* v. *Irwin*, 612 F.2d 1182, 1188 (9th Cir. 1980).

We believe that the present circumstances are closer to those in *Glover* than in *Manning*.[15] The remarks of the detectives were not calculated or of a nature to subvert the attorney-client relationship by leaving doubts as to the competence of defense counsel. Cinelli testified that he retained full confidence in the ability of his counsel. Finally, we note from our review of the record that defense counsel mounted a vigorous defense. We conclude that there was no impairment of the attorney-client relationship.

Last, Cinelli claims that, as a result of the interview, the Commonwealth learned the identity of a potential alibi witness, his codefendant Costa. The record does not bear out this claim. The Commonwealth had identified Costa as a possible suspect prior to this interview. Cinelli himself had mentioned Costa's name in his statement to the Medford police at the time of his arrest on May 7, 1981. The reference to Costa during the interview did not lead the Commonwealth to Costa and did not result in Costa's arrest and indictments. There was no error in the denial of the motion to dismiss.

---

[15] We note that in *United States* v. *Morrison, supra* at 362, the government agents disparaged defense counsel. Yet the Court found no claim of continuing prejudice or a substantial threat thereof. *Id.* at 365 & n.2.

6. *Suppression of post-arrest statements.* Cinelli argues that the statements that he made while in custody on the morning of his arrest should have been suppressed. He contends that he lacked the mental capacity to waive his rights voluntarily and that he had requested the presence of an attorney at several points. See *Edwards* v. *Arizona*, 451 U.S. 477, 482-483 (1981).

Lieutenant Leo A. Sacco, one of the arresting officers, and Cinelli both testified at a suppression hearing before the trial judge on October 6, 1981. The judge made subsidiary findings of fact from which he concluded that Cinelli was alert, never requested the presence of an attorney, and voluntarily waived his rights. We have examined the totality of the circumstances leading to the waiver, including the conduct and character of the accused and the details of the interrogation, *Commonwealth* v. *Daniels*, 366 Mass. 601, 606 (1975), and find no error.

The evidence warranted the findings that Cinelli was properly advised of his rights and possessed sufficient mental capacity to waive them. It is clear from Cinelli's own testimony that he willingly gave the police a coherent statement concerning his whereabouts on May 2, despite his awareness that he had a right not to do so. The judge's findings are amply supported by the record.

7. *Suppression of items seized during the search of Cinelli's residence.* Cinelli's next claim of error is that items seized during a search of his residence at the time of his arrest should have been suppressed. These items consisted of two boxes of .32 caliber bullets of two types and several caps, and were introduced in evidence at trial. The trial judge found, and we agree, that an affidavit attached to the warrant contained facts establishing probable cause to believe that Cinelli committed the crime, that the items listed were connected with the crime, and that Cinelli resided at the premises. Cinelli does not dispute this. The issue before us is whether those facts established probable cause to believe that the listed items reasonably could be expected to be located at Cinelli's residence.

An affidavit must contain enough information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues. *Commonwealth* v. *Cefalo,* 381 Mass. 319, 328-329 (1980). Information establishing that a person is guilty of a crime does not necessarily constitute probable cause to search the person's residence. *United States* v. *Charest,* 602 F.2d 1015 (1st Cir. 1979). But an affidavit must be read in "a commonsense and realistic fashion," *Commonwealth* v. *Anderson,* 362 Mass. 74, 75 (1972), quoting *United States* v. *Ventresca,* 380 U.S. 102, 108 (1965), and the nexus between the items to be seized and the place to be searched need not be based on direct observation. *United States* v. *Lucarz,* 430 F.2d 1051, 1055 (9th Cir. 1970). The nexus may be found in "'the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property.'" *Id. United States* v. *Pheaster,* 544 F.2d 353, 372-373 (9th Cir. 1976), cert. denied sub nom. *Inciso* v. *United States,* 429 U.S. 1099 (1977).

We believe that the items specified in the warrant and seized during the search were the type of things that reasonably might be expected to be located in the residence of a person who had participated in an armed robbery. 1 W. LaFave, Search and Seizure § 3.7, at 709 (1978). The inference is also compelling that the ammunition, which could not be traced to the robbery and which could be used in a future robbery, was at Cinelli's residence. A sufficient nexus existed between the items to be seized and Cinelli's residence. We note that our decision is supported by our own case law, *Commonwealth* v. *Cefalo, supra* at 331, by case law from other State courts, *Mills* v. *State,* 278 Md. 262, 276-280 (1976), *Bollinger* v. *State,* 556 P.2d 1035, 1038-1039 (Okla. Crim. App. 1976), and case law from the Federal courts. *United States* v. *Morris,* 647 F.2d 568, 573 (5th Cir. 1981). *United States* v. *Green,* 634 F.2d 222, 226

(5th Cir. 1981) (dicta). *United States* v. *Melvin,* 596 F.2d 492, 497-498 (1st Cir.), cert. denied, 444 U.S. 837 (1979). *United States* v. *Pheaster, supra. United States* v. *Lucarz, supra.*[16]

8. *Disclosure of the "tips" file.* Both defendants argue that the Commonwealth's failure to provide them with an "anonymous tips" file compiled by the Medford police department violated the rule of *Brady* v. *Maryland,* 373 U.S. 83 (1963). Under *Brady* and its progeny, see *Moore* v. *Illinois,* 408 U.S. 786 (1972); *United States* v. *Agurs,* 427 U.S. 97 (1976), the failure by the prosecutor to disclose evidence which is exculpatory and material in nature is a denial of due process and requires a new trial. It is the defendants' claim that, since the information contained in the file would have tended to establish that others committed the crimes, the file was both exculpatory and material.

At the outset, we note that this claim has been rejected by two different judges of the Superior Court. After Cinelli filed a motion seeking disclosure of the file, a judge of the Superior Court conducted an in camera review of the file's contents, denied the motion, and impounded the file. The motion was renewed before the trial judge. He denied the motion after an in camera review and found that "the file would not be of any significant aid" to the defendants. We have reviewed the file, and we agree.

It is true that the defendants were entitled to introduce evidence which showed that other persons committed the

---

[16] The instant case is distinguishable on its facts from *United States* v. *Charest,* 602 F.2d 1015 (1st Cir. 1979), and we do not reach the question whether we would follow *Charest.* First, the search here occurred only five days after the arrest. Second, the search in *Charest* was for a single gun used in an isolated incident. *Id.* at 1017. Here, the search was for the fruits and instrumentalities of the crime. Clothes, money, weapons, and ammunition were the objects of the search. It is much more reasonable to infer that those items would be at the offender's residence than would a single handgun used in a murder. We note also that items such as ammunition could not be traced to the robbery but could be used in the future. Contrast *United States* v. *Charest, supra.* The instant case is closer to the facts of *United States* v. *Melvin,* 596 F.2d 492 (1st Cir.), cert. denied, 444 U.S. 837 (1979).

crime for which they were charged. *Commonwealth* v. *Keizer*, 377 Mass. 264, 266-268 (1979). But the evidence must not be too weak in probative value. *Commonwealth* v. *Mandeville*, 386 Mass. 393, 399 (1982). Accord *Commonwealth* v. *Keizer, supra* at 267, quoting *Holt* v. *United States*, 342 F.2d 163, 166 (5th Cir. 1965) (evidence should be of "substantial probative value"). In the instant case, the evidence consisted of hearsay statements made in most instances by anonymous declarants who had no personal knowledge of the crime. Further, the statements lacked any indicia of reliability. *Commonwealth* v. *Mandeville, supra.* The probative value of these statements was minimal. Other statements, by identified informants, were suggestions as to the identity of the person shown in a televised composite drawing of the alleged perpetrator. Such statements, by persons not witnesses to the crime, would clearly be inadmissible. There was no error.

*Judgments affirmed.*