Kern, Leila R., J.
A grand jury indicted the defendant, Leo M. Lopez, on four counts of filing a fraudulent motor vehicle insurance claim in violation of G.L.c. 266, §11 IB, four counts of attempt to commit a criminal act in violation of G.L.c. 274, §6 and two counts of conspiracy in violation of G.L.c. 274, §7. Lopez now moves to dismiss all indictments against him on the ground that law enforcement intentionally interfered with his constitutional right to counsel.
Findings of Fact
This court took evidence on January 18 and 25, 2008. For purposes of this motion only, Attorney Carl Donaldson represented Lopez so that Attorney Eric Taitano could testify. Based on the weight of the credible evidence and reasonable inferences drawn therefrom, this court finds the following facts.
On September 4, 2006, Lawrence Police Officers Michael Simard and Ryan Guthrie, together with Kim Giardina of the Insurance Fraud Bureau,[1] traveled to Pooler, Georgia, in order to apprehend Lopez on several outstanding warrants related to the indictments. (Tr. vol. 1 at 178-81, vol. 3 at 6.) Based on their investigation, the police alleged that Lopez had staged motor vehicle accidents in Lawrence and surrounding areas. (Tr. vol. 1 at 179.) The officers’ goal was to arrest Lopez and get him to cooperate with the police and provide information on chiropractors, attorneys and other professionals believed to be involved in the insurance fraud scheme. (Tr. vol. 3 at 45.)
The following morning, with the assistance of U.S. Marshals and the Pooler Police Department, the officers arrested Lopez at his house in Pooler. (Tr. vol. 1 at 78-82, 110, 179-84, vol. 3 at 6-8.) At the time of the arrest, Simard gave Lopez’s wife,[2] Elsa Moure, his business card with his mobile phone number on it and told her that she could call him if she needed anything and he would “keep her up to date” on her husband. (Tr. vol. 1 at 184-85.) After the police took Lopez into custody, Moure immediately telephoned Lopez’s sister, Ana Lopez (“Ana”), and asked her to get a lawyer for Lopez. (Tr. vol. 1 at 62, 83.)
At the advice of her friends, Ana tried to retain Attorney Eric Taitano to represent Lopez. (Tr. vol. 1 at 62-63.) Ana decided to use Taitano because he speaks Spanish and would therefore be able to communicate with Ana’s parents, who do not speak English. (Tr. vol. 1 at 62.) Ana telephoned Taitano’s office and indicated that she was seeking a lawyer to represent her brother. (Tr. vol. 1 at 11, 63.) As a result of the conversation, Ana went to Taitano’s office to speak with him. (Tr. vol. 1 at 11, 63.)
Meanwhile, Simard, Guthrie and Giardina interviewed Lopez at the Chatham County Correctional Facility. (Tr. vol. 1 at 116-17, 187-88, vol. 3 at 10-11.) Simard informed Lopez of the case against him and that he had been arrested for staging two accidents. (Tr. vol. 1 at 192, vol. 3 at 14.) Simard told Lopez that several other people involved had confessed that Lopez had staged the accidents and had brought them to chiropractors for treatment and to attorneys to initiate lawsuits. (Tr. vol. 1 at 192.) Simard advised Lopez that the police were working on several other cases possibly involving Lopez and that the Attorney General was interested in him as a result of his alleged involvement in organizing fraudulent accidents for which other individuals had already been prosecuted. (Tr. vol. 1 at 192-93.) The officers showed Lopez a chart with pictures of other suspects believed to be involved, including Attorney Socrates De La Cruz. (Tr. vol. 1 at 117, vol. 3 at 15.) In the cases for which Lopez was charged, De La Cruz was the attorney to whom Lopez allegedly brought the accident claimants. (Tr. vol. 1 at 240.) *604 Simard believed that Taitano and De La Cruz were law partners and that Taitano was also involved in insurance fraud.[3] (Tr. vol. 1 at 240-41, vol. 2 at 43-44.) When Lopez saw De La Cruz’s photo on the chart he said, "You guys are looking at the wrong guy.” (Tr. vol. 1 at 117, vol. 3 at 15.)
Lopez wanted to make a deal with the police. (Tr. vol. 1 at 158, 193-94.) Simard explained to Lopez that only the prosecutor could make a deal with him, but Lopez could give the police something to take to the prosecutor and then Lopez’s attorney could work out a deal with the prosecutor. (Tr. vol. 1 at 194.) Simard advised Lopez not to hire any lawyer that had paid him to stage the accidents or was otherwise involved in the fraud because the lawyer would work to protect his own interests rather than Lopez’s. (Tr. vol. 1 at 195.) Among the lawyers that Simard cautioned Lopez not to retain were Taitano and De La Cruz. (Tr. vol. 1 at 117, 195.) Simard told Lopez that if he cooperated, it would be easier for him, and that he could lose his children as a result of the crimes if convicted. (Tr. vol. 1 at 117.) Lopez did not make any incriminating statements during this interview. (Tr. vol. 2 at 67, vol. 3 at 16.)
Later that morning, Moure telephoned Simard and informed him that Ana wished to speak with him. (Tr. vol. 1 at 198, vol. 3 at 20.) Simard telephoned Ana, but did not get an answer, so he left her a message. (Tr. vol. 1 at 64-65, 198.) Ana’s daughter relayed the message to Ana and provided Ana with Simard’s phone number. (Tr. vol. 1 at 65.)
Several minutes later, Ana returned Simard’s call. (Tr. vol. 1 at 65, 198.) Ana made the call from one of the telephones at Taitano’s office, with Taitano listening in on the conversation without Simard’s knowledge. (Tr. vol. 1 at 14-16, 65-66.) During the telephone conversation, Ana informed Simard that her family had hired Taitano to represent Lopez. (Tr. vol. 1 at 16, 65, 198.) In response, Simard told Ana that Taitano was “no good” and would be more concerned with protecting the interests of his “partner” Socrates De La Cruz than Lopez’s rights. (Tr. vol. 1 at 17, 65, 198.) Simard further stated that he would be unable to help Ana’s family if they retained Taitano. (Tr. vol. 1 at 17, 65, 198-99.) Ana told Simard that she was going to keep Taitano. (Tr. vol. 1 at 65-66.)
Taitano thereafter telephoned Simard and identified himself, but Simard told him he was busy and hung up. (Tr. vol. 1 at 17-18, 199.) Simard was just returning to the jail at that time to pick up Lopez and did not have time to talk. (Tr. vol. 1 at 199.) Taitano called Simard several more times, but he did not answer. (Tr. vol. 1 at 18, 66, 199.) Taitano then called Simard from a phone that Ana borrowed from a friend. (Tr. vol. 1 at 18, 66-67.) Simard answered his phone this time, and Taitano quickly communicated that he represents Lopez and that Simard was not to question or interrogate Lopez without him present. (Tr. vol. 1 at 18-19.) Simard again hung up on Taitano. (Tr. vol. 1 at 19.) Taitano called Simard again and left a voice message reiterating that Lopez was his client and that Simard was not to question him. (Tr. vol. 1 at 19, 199.)
After the telephone conversation with Taitano, Simard called Assistant District Attorney Greg Friedholm, informed him of the conversation and asked him how to proceed. (Tr. vol. 1 at 200.) After receiving Friedholm’s advice, Simard decided to speak with Lopez further. (Tr. vol. 1 at 200.)
Simard also spoke with Moure. (Tr. vol. 1 at 86.) Simard told her that he could no longer speak with her because Taitano was going to represent Lopez. (Tr. vol. 1 at 86.) Simard sounded veiy upset and angered by the fact that Taitano was going to represent Lopez. (Tr. vol. 1 at 86.)
Just before Lopez’s arraignment in Georgia, Simard told Lopez that Ana retained Taitano to represent him. (Tr. vol. 1 at 200-01, vol. 3 at 22.) In response, Lopez stated that he did not hire Taitano as his lawyer. (Tr. vol. 1 at 201, vol. 3 at 22.) Simard asked Lopez if he wished to continue speaking with the police, and Lopez replied affirmatively and said, “Don’t worry, I got you.” (Tr. vol. 1 at 201, vol. 3 at 23.) Lopez asked Simard if he could call his sister, but Simard would not let him. (Tr. vol. 1 at 119.)
After the arraignment, a second interview took place back at the jail. (Tr. vol. 1 at 120, 202, vol. 3 at 23.) Lopez again wanted to make a deal before he would proceed with the interview. (Tr. vol. 1 at 203, vol. 3 at 25.) Simard told Lopez that Taitano was partners with De La Cruz and that he did not think Taitano would look out for Lopez’s best interests. (Tr. vol. 1 at 120, vol. 3 at 72.) Simard told Lopez that he would be better off using a court-appointed lawyer than using Taitano and that Taitano would be more interested in protecting his partner, De La Cruz. (Tr. vol. 1 at 120.) Simard told Lopez about another defendant in a separate case who cooperated with Simard and is now better off. (Tr. vol. 1 at 121.) Lopez felt “confused.” (Tr. vol. 1 at 120.) Lopez told the officers that he did not want to talk to the police and asked to speak with his counsel. (Tr. vol. 1 at 164, 205, vol. 3 at 26.) Simard got upset and slammed his papers on the desk. (Tr. vol. 1 at 164.) The officers terminated the interview at this point. (Tr. vol. 1 at 164, 205, vol. 3 at 26.) Simard told Lopez to think about what he was doing and an officer brought him back to his cell. (Tr. vol. 1 at 124.) Lopez did not make any incriminating statements during this interview. (Tr. vol. 3 at 25.)
That evening, Taitano spoke with Moure on the telephone. (Tr. vol. 1 at 20.) Based on that conversation, Taitano believed that Simard was still questioning Lopez. (Tr. vol. 1 at 20.) Taitano faxed a letter to Chief Romero of the Lawrence Police Department. (Tr. vol. 1 at 20.) The letter informed Romero that he believed Simard was continuing to interrogate Lopez after being informed that Taitano represented Lopez. *605 He asked Romero to ensure that the interrogation ceased. (Tr. vol. 1 at 21-22.) Taitano let Romero know that Simard was making negative remarks about Taitano to Lopez and that he expected such remarks to stop. (Tr. vol. 1 at 23.) Romero never responded to the letter. (Tr. vol. 1 at 35.)
The following morning, the police brought Lopez to the airport to catch a flight back to Massachusetts. (Tr. vol. 1 at 124-25, 205-06, vol. 3 at 27-28.) Once back in Massachusetts, Taitano went to the Lawrence police station to speak with Lopez. (Tr. vol. 1 at 28-29, 208.) Taitano and Simard got into an argument about each other’s tactics and ethics. (Tr. vol. 1 at 31-33, 208-09.) Simard told another officer at the station that Taitano was allowed only ten minutes with Lopez. (Tr. vol. 1 at 33-34.)
Since their return to Massachusetts, Simard has arrested Lopez and Moure on a number of occasions. (Tr. vol. 1 at 87, 90, 130, 169-71, vol. 3 at 31-32.) On one occasion, Simard was doing surveillance and spotted Moure’s vehicle in a grocery store parking lot. (Tr. vol. 1 at 209-10.) He had set up the surveillance in order to see who was driving the vehicle. (Tr. vol. 1 at 212.) Simard decided to effect a motor vehicle stop because Moure had been living in Massachusetts for two months but had not yet registered her car in Massachusetts. (Tr. vol. 1 at 70-71, vol. 2 at 62.) Simard considers this a form of insurance fraud. (Tr. vol. 1 at 210.) Simard ran the license plate and discovered that the registration had expired. (Tr. vol. 1 at 210.) When Moure got back in her vehicle and drove off, Simard had another officer pull her over. (Tr. vol. 1 at 210.) Moure telephoned Ana and let her know that she was stopped by the police. (Tr. vol. 1 at 68-69.) Ana and Lopez then walked to where Moure was pulled over, which was a short distance from their house. (Tr. vol. 1 at 68-69.) Lopez told Simard that the registration was in fact up to date and proof of the registration was in the glove compartment of the vehicle. (Tr. vol. 1 at 69, 212-13.) Simard refused to check the documentation of the registration because he found it “irrelevant.” (Tr. vol. 1 at 69, vol. 2 at 56.) Simard arrested Moure for failure to produce a driver’s license and had the vehicle towed. (Tr. vol. 1 at 210, vol. 2 at 57.) Simard also cited her for failure to register her vehicle in Massachusetts. (Tr. vol. 1 at 210, vol. 2 at 57.) The following day, Simard discovered that the registration was in fact active. (Tr. vol.' 1 at 213.)
The last time Simard arrested Lopez was on December 28, 2007. (Tr. vol. 1 at 40, 171-72, vol. 2 at 30.) Lopez was arrested on a fugitive from justice warrant in New Hampshire, and was held by the police until Monday, December 31, 2007. (Tr. vol. 1 at 40-41.) Lopez was working in New Hampshire at the time, but did not live there. (Tr. vol. 1 at 41, 172.) Simard knew that Lopez had shown up for all of his court appearances (Tr. vol. 2 at 42-43), but also believed that Lopez had fled from the police in the past (Tr. vol. 1 at 224).
Lopez does not enjoy the way his life has been going since his decision to hire Taitano. (Tr. vol. 1 at 168.) He has found that Simard has been “getting away with eveiything that he wants to do.” (Tr. vol. 1 at 168.) Lopez still believes in Taitano, but has found that Taitano has been unable to protect him from Simard. (Tr. vol. 1 at 168-69.) In addition, Lopez is uncertain whether he would be able to afford to retain another lawyer. (Tr. vol. 1 at 175.)
Rulings of Law
In extreme cases, law enforcement’s interference with the attorney-client relationship requires dismissal of the indictment with prejudice. See, e.g., Commonwealth v. Fontaine, 402 Mass. 491, 497 (1988) (improper recording of defendant’s discussions with counsel); Commonwealth v. Manning, 373 Mass. 438, 439 (1977). In determining whether the “drastic remedy” of dismissal is warranted, the court should consider whether dismissal is necessary to cure the potential prejudice to the defendant. Commonwealth v. King, 400 Mass. 283, 291-92 (1987), quoting Commonwealth v. Hine, 393 Mass. 564, 573 (1984) (“[A]ny remedy should be tailored to cure the prejudice to the defendant”); Manning, 373 Mass. at 443-44 (“The focus must be ... on the remedy necessary to cure the impairment”); see Commonwealth v. Cinelli, 389 Mass. 197, 210 (1983). “Absent egregious misconduct or at least a serious threat of prejudice, the remedy of dismissal infringes too severely on the public interest in bringing guilty persons to justice.” Cinelli, 389 Mass. at 210.
Lopez premises his argument on Commonwealth v. Manning, 373 Mass. 438 (1977). In Manning, a federal drug enforcement agent telephoned the defendant approximately two weeks after his arraignment, without the knowledge or permission of the defendant’s counsel. Id. at 440. The purpose of the call was to induce the defendant to become a government informant. Id. “During the course of the conversation, [the agent] ‘made several disparaging remarks about [the defendant’s] counsel and the manner in which he was conducting the defense of the . . . case’ and ‘indicated that the tactics of defense counsel would not insure the defendant being kept out of jail.’ ” Id. The following day, the defendant telephoned the agent’s office and spoke with a different agent who made similarly disparaging remarks about the defendant’s counsel and urged the defendant to cooperate with authorities. Id. The Court found that this “deliberate and intentional attack by government agents on the relationship between [the defendant] and his counsel in a calculated attempt to coerce the defendant into abandoning his defense” required dismissal of the indictment. Id. at 443. In rejecting the possibility that the prejudice to the defendant could be remedied by a new trial, the Court noted that “the officer’s misconduct was so pervasive as to preclude any confident assumption that proceedings at a new trial would be free of the *606 taint.” Id. at 444. The Court declined, however, to adopt a “per se rule which would mandate dismissal of an indictment in cases in which government agents intentionally attempt to subvert the attorney-client relationship.” Id.
This court finds the facts in the present case distinguishable in material respects from what occurred in Manning. Unlike the federal agents in Manning, Simard had a good faith reason for cautioning Lopez against retaining Taitano as his attorney. Simard had reason to believe that De La Cruz was involved in the fraudulent motor vehicle accidents allegedly staged by Lopez based upon information obtained in the ongoing investigation. Simard also had reason to believe that Taitano may have participated in the fraud, or might be more interested in protecting De La Cruz than Lopez. Simard may be grossly mistaken in his belief that either attorney was actually involved in insurance fraud. Nevertheless, Simard’s suspicions justified cautioning Lopez not to retain an attorney that Simard believed was involved in the very crimes for which Lopez was charged. Furthermore, Lopez made the conscious decision to be represented by Taitano after Simard had already cautioned Lopez that Taitano was a suspect. This is not a case where law enforcement has disparaged the defendant’s attorney in an effort to coerce the defendant to leave his attorney and abandon his defense. Rather, this case involves law enforcement’s attempts to influence the defendant’s choice of attorney so as to avoid a potential conflict of interest. The negative remarks Simard made regarding Taitano are not sufficiently egregious to warrant dismissal of the indictments. Nor is dismissal necessaiy to cure the threat of prejudice to Lopez, particularly where Simard’s remarks did not result in any incriminating statements made by Lopez.
After Lopez’s return to Massachusetts, however, this court finds that some of Simard’s behavior pushed the outer limits of acceptable police practices. This court has no doubt that Simard kept an unduly tight reign on Lopez and his family in an effort to bring down what, in Simard’s view, was an organized criminal collaboration between professionals and pseudo-victims to defraud insurance companies. As well-intentioned as he may be, Simard must not pressure Lopez to lose faith in Taitano, abandon his defense and cooperate with the police. Lopez has made his choice of counsel clear. Taitano has not been charged with insurance fraud and, by Simard’s own admission, there is no indication that Lopez and Taitano conspired to commit insurance fraud. Simard, and the entire prosecutorial team, must respect Lopez’s choice of attorney and allow Lopez to work with Taitano to defend against the charges for which he has been indicted.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s Motion to Dismiss is DENIED.

The Insurance Fraud Bureau is an agency funded by insurance companies to fight fraud. (Tr. vol. 1 at 179.)

Lopez and Moure have not been formally married, although he refers to her as his wife. (Tr. vol. 1 at 93, 109.)

Attorneys Taitano and De La Cruz share office space, but are not law partners. (Tr. vol. 1 at 7.) As a precautionary measure, Taitano consulted with Arnold Rosenfeld, formerly Bar Counsel for the Massachusetts Board of Bar Overseers, and obtained an opinion letter indicating that Taitano is not partners with De La Cruz. (Tr. vol. 1 at 7.) Simard had not seen that letter and, in any case, suspected Taitano of having at least some involvement in approximately three of the cases Simard had investigated. There is no indication that Taitano and Lopez worked together on any of those cases. (Tr. vol. 1 at 240-41.)