NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12176

COMMONWEALTH  vs.  BOBBY LESLIE
(and five companion cases[1]).


Suffolk.     November 7, 2016. - May 9, 2017.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, &
Budd, JJ.[2]


Firearms.  Practice, Criminal, Motion to suppress.
    Constitutional Law, Search and seizure, Privacy.  Search
    and Seizure, Multiple occupancy building, Curtilage,
    Expectation of privacy.



    Indictments found and returned in the Superior Court
Department on December 16, 2014.

    Pretrial motions to suppress evidence were heard by Charles
M. Hely, J.

    An application for leave to prosecute an interlocutory
appeal was allowed by Hines, J., in the Supreme Judicial Court
for the county of Suffolk, and the appeal was reported by her to
the Appeals Court.  The Supreme Judicial Court granted an
application for direct appellate review.

_____

    [1] Two against Bobby Leslie and three against Lacy Price.

    [2] Justice Botsford participated in the deliberation on this
case prior to her retirement.

Zachary Hillman, Assistant District Attorney, for the
Commonwealth.
     Patrick Levin, Committee for Public Counsel Services, for
Bobby Leslie.
     MarySita Miles for Lacy Price.

     HINES, J.  The defendants, Bobby Leslie and Lacy Price,
were indicted on charges of unlawful possession of a sawed-off
shotgun,[3] G. L. c. 269, § 10 (c); unlawful possession of a loaded
firearm, G. L. c. 269, § 10 (n); and possession of ammunition
without a firearm identification card, G. L. c. 269, § 10
(h) (1).[4]  The indictments arose from a May, 2014, warrantless
search of the porch and side yard of a three-family home in the
Dorchester section of Boston where the defendant Price resided.
The search revealed a loaded sawed-off shotgun under the porch.
Leslie was arrested at the scene, and after further
investigation, Price was arrested.  A judge of the Superior
Court allowed the defendants' motions to suppress the sawed-off
shotgun on the ground that a warrant was required to search the
area under the porch in light of Florida v. Jardines, 133 S. Ct.

_____

[3] General Laws c. 140, § 121, defines a sawed-off shotgun as
"any weapon made from a shotgun, whether by alteration,
modification or otherwise, if such weapon as modified has one or
more barrels less than [eighteen] inches in length or as
modified has an overall length of less than [twenty-six]
inches."

[4] Price was also indicted as a subsequent offender on the
charge of unlawful possession of a firearm, G. L. c. 269,
§ 10 (d).

1409, 1417 (2013), and art. 14 of the Massachusetts Declaration of Rights.

The Commonwealth filed a timely appeal from the allowance of the defendants' motions to suppress. A single justice of this court granted leave to pursue an interlocutory appeal and reported the case to the Appeals Court. We allowed the defendants' application for direct appellate review to clarify the application of the Jardines warrant requirement to a search in a multifamily home. Following the analytical framework set out in Jardines, 133 S. Ct. at 1414-1417, we conclude that the side yard of the defendant's multifamily home was a "constitutionally protected area," and that the intrusion into that area to search for a weapon implicated the warrant requirement of the Fourth Amendment to the United States Constitution and art. 14. Because the warrantless intrusion into this constitutionally protected area was an unreasonable search that violated the defendants' Federal and State constitutional rights, we affirm the order allowing the defendants' motions to suppress.

Background. We recite the facts as found by the motion judge, "supplemented by evidence in the record that is uncontroverted and that was implicitly credited by the judge." Commonwealth v. Warren, 475 Mass. 530, 531 (2016), citing Commonwealth v. Melo, 472 Mass. 278, 286 (2015). On May 29,

2014, around 2 P.M., Boston police Detective Daniel Griffin was working in the drug control unit[5] as a plainclothes officer, driving an unmarked vehicle, in the neighborhood of Bowdoin Street and Geneva Avenue in Dorchester. Based on information from Officer Eric Merner, another member of his unit, Detective Griffin began observing a group of four men walking down Everton Street from Olney Street, toward Geneva Avenue. The men appeared "nervous."[6] Once Detective Griffin realized that the men were approaching a certain residence on Everton Street (residence), he communicated to Officer Merner that the residence was a known location of gang associates and that the neighborhood in which the residence is located was a "hotspot" for shootings and firearms offenses.[7]

---

[5] The unit consisted of a sergeant detective, Detective Daniel Griffin, and five other police officers.

[6] Although the men were described as looking "nervous," Detective Griffin did not see Leslie grab at his waist, which can indicate that an individual possesses a firearm without a holster, but he noted that Leslie swiveled his head in a surveillance-conscious manner while walking towards a certain residence on Everton Street.

[7] Detective Griffin was familiar with that neighborhood of Dorchester, and specifically with Everton Street, from his experience in the youth violence strike force and the drug control unit. He had arrested an individual with a firearm on the front porch of the residence sometime in the previous five years, but could not recall the date more specifically. Additionally, Detective Griffin had previously made other arrests in that neighborhood and on Everton Street. However, neither defendant was present during the previous arrest at the residence and none of the men present at the residence on May

The property at the residence, which is a three-family home, was fenced in on the front and left side. A chain link fence, with an attached gate at the walkway leading to the sidewalk, ran across the edge of the front yard. A tall wooden fence ran along the left side[8] of the lot, five to six feet from the side of the porch and the house. The left-side porch area was blocked by a large, blue recycling bin, which obstructed the view of the area from Everton Street.

After repositioning his vehicle down from and opposite the residence,[9] Detective Griffin observed the four men, including Leslie, enter the front gate of the residence and meet a fifth man, Price, on the porch. Approximately five minutes after the men arrived, Leslie walked off the front porch, swiveling his head from side to side in a surveillance-conscious manner, toward the left side of the front yard to the side porch area. Although Detective Griffin's view was obstructed by the recycling bin, two trees, and some motor vehicles, he was able

29, 2014, was known to Detective Griffin or the other officers present.

[8] The fence was on the left side of the property from a vantage point of facing the front of the home.

[9] Everton Street is a one-way street running from Olney Street to Geneva Avenue. Detective Griffin initially observed the residence from the right side of Everton Street directly across from the residence. However, to avoid detection, he drove around the block and parked on the right side of Everton Street, about four houses away. He estimated the trip around the block took him about ten seconds.

to observe Leslie crouch down and appear to manipulate something under the side porch.  Detective Griffin could not see what object Leslie was manipulating.  Based on Detective Griffin's experience with one hundred or more prior firearm arrests, Leslie's crouching down and swiveling his head more rapidly as he approached the side porch area were consistent with an individual who illegally possessed a firearm.

Next, Detective Griffin observed Price walk over to the side porch area as Leslie had done previously, also swiveling his head in a surveillance-conscious manner, bending down, looking under the porch, and then returning to the group on the front porch.  Detective Griffin observed Leslie return to the side porch area two more times, each time swiveling his head as before, bending down, and manipulating something on the ground. On Leslie's third trip to the area, as he stood back up after having bent down, he made a distinctive gesture that Detective Griffin described as imitating the firing of a shotgun or rifle in the air.  Leslie raised his hands and forearms near his shoulders, with one hand near the trigger area, as he simulated recoil.

From these observations, Detective Griffin suspected that a firearm was hidden under the left-side porch area.  He was aware from his experience as a police officer that individuals often place illegal firearms nearby but not on one's person, for easy

access.  Detective Griffin then contacted the other members of his unit and members of the youth violence strike force for assistance.  The officers intended to approach the men at the residence to conduct field interrogation observations to "see what [the men] were up to."[10]

The officers, seven in total, walked through the front gate at the walkway and proceeded to the front porch.  Detective Griffin could not recall whether the gate was open, but it was not locked.  The officers approached the men on the porch and began to engage them in conversation.  Detective Griffin, however, veered off the walkway and walked to the left side of the yard, where Leslie and Price previously had gone.  He saw a sawed-off shotgun on the ground under the porch.  The wooden handle of the shotgun protruded out from under the porch.  Although the shotgun was not visible from the street or from the gate near the sidewalk, it was plainly visible if one were present in the left side of the yard and walked behind the recycling bin.

Detective Griffin immediately notified the other officers of the presence of the sawed-off shotgun, and Leslie was placed

---

[10] "A 'field interrogation observation' . . . has been described as an interaction in which a police officer identifies an individual and finds out that person's business for being in a particular area."  Commonwealth v. Warren, 475 Mass. 530, 532 n.5 (2016), quoting Commonwealth v. Lyles, 453 Mass. 811, 813 n.6 (2009).

under arrest after officers determined that he did not have a firearm identification card.[11]  The officers obtained identifying information from the other men on the porch, and following further investigation, Price was also arrested in connection with the weapon.  Subsequently, the officers learned that Price lived at the residence in the second-floor apartment,[12] but Leslie was not a resident.

Discussion.  The judge allowed the motions to suppress, ruling that the search was governed by Jardines, 133 S. Ct. at 1417-1418, in which the United States Supreme Court held that a warrantless search of the front porch of a single-family home with a drug-sniffing dog violated the Fourth Amendment.  The Court reasoned that the porch was part of the curtilage to which the police could lawfully approach but that in bringing a drug-sniffing dog, the police exceeded the scope of their implied license to enter the defendant's property.  The judge recognized that Jardines involved a single-family home, but he concluded that Price (and by extension Leslie) had a reasonable expectation of privacy in the side yard of the small three-family home where the search occurred.  The intrusion into the side yard to search for a suspected hidden weapon was no

_____

[11] When Leslie was asked whether he had a license to carry a firearm he answered, "For what?  I don't have a gun on me."

[12] Nothing in the record establishes whether Price owned the residence or whether he resided there as a tenant.

different from bringing a drug-sniffing dog to the front porch of a single-family home.  Thus, the search required a warrant.

The Commonwealth claims error in the judge's order, arguing that because Jardines does not apply to a multifamily home, the motion properly could be granted only if the defendants established that Price had either exclusive control over the home or a reasonable expectation of privacy in the area searched.  The Commonwealth also argues that even if the intrusion into the side yard was a search of a constitutionally protected area, the judge erred in finding that the police lacked probable cause and exigent circumstances to justify the search.  We address these arguments in turn.

1.  Standard of review.  "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error . . . ."  Commonwealth v. Fernandez, 458 Mass. 137, 142 (2010), quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004).  "However, '[w]e review independently the application of constitutional principles to the facts found.'"  Warren, 475 Mass. at 534, quoting Commonwealth v. Wilson, 441 Mass. 390, 393 (2004).  Where, as here, the issue is whether a search occurred within the curtilage of a home, "we undertake our independent review cognizant that there is no 'finely tuned formula' that demarcates the curtilage in a given case."

Fernandez, supra, quoting United States v. Dunn, 480 U.S. 294, 301 (1987).

2. The entry into the side yard. As a threshold matter, we briefly address the issue of standing. "When a defendant is charged with a crime in which possession of the seized evidence at the time of the contested search is an essential element of guilt, the defendant shall be deemed to have standing to contest the legality of the search and the seizure of that evidence." Commonwealth v. Amendola, 406 Mass. 592, 601 (1990). Here, the defendants were charged with possession of a sawed-off shotgun and ammunition. Therefore, they have standing to challenge the legality of the search and seizure. The Commonwealth argues that even if the defendants have automatic standing, they cannot meet their burden to show that a search in the constitutional sense occurred.

In considering application of Jardines to a multifamily home, we begin with the observation that the Court's holding does not rest on the fact that the property was a single-family home. Rather, the warrant requirement followed from the Court's determination that the police entry onto the porch of the home with a drug-sniffing dog was an unlicensed "physical intrusion [into] a constitutionally protected area." Jardines, 133 S. Ct. at 1414, quoting United States v. Knotts, 460 U.S. 276, 286 (1983) (Brennan, J., concurring in the judgment). We interpret

the Jardines holding as a clarification of the appropriate framework for the analysis of the applicability of the Fourth Amendment protection against an unreasonable search rather than a pronouncement limited only to single-family homes. Thus, we decline to limit Jardines' holding to single-family homes or to fashion a rule categorically excluding areas associated with multifamily homes as curtilage and thus placing them beyond the reach of the protections of the Fourth Amendment and art. 14.

We agree also that "[d]istinguishing Jardines based on the differences between the front porch of a stand-alone house and the closed hallways of an apartment building draws arbitrary lines." United States v. Whitaker, 820 F.3d 849, 854 (7th Cir. 2016). Moreover, "a strict apartment versus single-family house distinction is troubling because it would apportion Fourth Amendment protections on grounds that correlate with income, race, and ethnicity." Id. Thus, we reject the Commonwealth's argument that in cases involving a search in a multifamily home, the validity of the search turns on the defendant's exclusive control or expectation of privacy in the area searched. The teaching of Jardines is that when the search is in or about a person's home, the essential question is whether the area searched is within the home or its curtilage.

In Jardines, 133 S. Ct. at 1414, the Court refocused the analysis of "constitutionally protected area" to emphasize the

words of the Fourth Amendment, noting that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections':  persons, houses, papers, and effects."  Id., quoting Oliver v. United States, 466 U.S. 170, 176 (1984).  Among the traditional property interests expressly protected by the Fourth Amendment, "the home is first among equals."  Jardines, supra.  Accordingly, Fourth Amendment jurisprudence has developed to accommodate a home's place in the hierarchy of protected interests.  It regards "the area 'immediately surrounding and associated with the home' -- what our cases call the curtilage -- as 'part of the home itself for Fourth Amendment purposes.'"  Id., quoting Oliver, supra at 180.  And "[t]he front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'"  Jardines, supra at 1415, quoting Oliver, supra at 182 n.12.  Indeed, the "right [to be free of unreasonable government intrusion] would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity."  Jardines, supra at 1414.  Thus, the essential question here is whether the side yard of the home was within the curtilage of the defendant's home.  If so, the police intrusion constituted a search requiring a warrant.

In the years since Jardines, the Supreme Court has not directly addressed whether porches and side yards of a multifamily home are within the constitutionally protected curtilage. However, the United States Courts of Appeals overwhelmingly have applied the four-factor test announced in Dunn, 480 U.S. at 301, to determine whether, in the multifamily home and apartment context, a particularly described area is curtilage. See, e.g., United States v. Hopkins, 824 F.3d 726, 731 (8th Cir.), cert. denied, 137 S. Ct. 522 (2016); United States v. Sweeney, 821 F.3d 893, 901 (7th Cir. 2016); United States v. Burston, 806 F.3d 1123, 1127 (8th Cir. 2015); United States v. Jackson, 728 F.3d 367, 373 (4th Cir. 2013), cert. denied, 134 S. Ct. 1347 (2014). Therefore, we rely on these cases for guidance in our analysis whether the side yard of the defendant Price's multifamily home was within the curtilage and apply the Dunn factors in resolving this issue. Dunn, 480 U.S. at 301.

In Dunn, the Supreme Court introduced a four-factor test to determine whether an area searched was within the home's curtilage: (i) "the proximity of the area claimed to be curtilage to the home"; (ii) "whether the area is included within an enclosure surrounding the home"; (iii) "the nature of the uses to which the area is put"; and (iv) "the steps taken by the resident to protect the area from observation by people

passing by." Id. The Court cautioned, however, that "combining these factors [does not] produce[] a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." Id. Instead, "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration -- whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id. Application of the Dunn factors to the facts found here supports the judge's conclusion that the porch and side yard of the residence were within the curtilage. See Fernandez, 458 Mass. at 144-145.

a. Application of the Dunn factors. i. Proximity. The porch was physically connected to the home itself, and as the Court in Jardines noted, "[t]he front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" Jardines, 133 S. Ct. at 1415, quoting Oliver, 466 U.S. at 182 n.12. Although the sawed-off shotgun was found under the porch area, the side yard was very close in proximity to the porch and, by extension, the house. This factor weighs in favor of a determination that the porch and side yard were part of the home's curtilage.

ii. Enclosure. The front yard was enclosed with a chain link fence and the left border of the front yard was enclosed

with a large wooden fence about five to six feet away from the porch where the sawed-off shotgun was recovered. Additionally, the chain link fence enclosed both the house and the porch area, allowing the inference that the porch and side yard "should be treated as an adjunct to the house." Dunn, 480 U.S. at 302. As the Supreme Court noted in both Oliver, 466 U.S. at 182 n.12, and Dunn, supra, "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage -- as the area around the home to which the activity of home life extends -- is a familiar one easily understood from our daily experience."

iii. Nature of use. The record reflects that the defendants were using the porch as an extension of Price's home. Price waited for his guests on the porch as they arrived, and the five men were on the porch and in the front yard for the entirety of the visit. Price used the porch area as an extension of his living room, to greet and entertain guests. Compare Dunn, 480 U.S. at 303 (strong odor of chemicals and sound of engines running suggested that defendant was not using barn as extension of his home). Although there is no evidence of Price's exclusive use of the porch and side yard, that fact is not dispositive, as it is merely a single factor in the calculus. On balance, the nature of Price's use of the porch

and side yard allows the inference that those areas were intimately connected to his home.

iv. Steps taken to protect from observation. Here, steps were clearly taken to obscure the view of the side yard and the area under the porch where the sawed-off shotgun was found. A large, blue recycling bin was placed in front of the area, which obstructed the view from the street. Additionally, the large wooden fence obscured the view of the area from the left side of the yard where the sawed-off shotgun was found. Although Detective Griffin testified that the fence in the front yard did not obstruct his view completely, his testimony established that he could not see what Leslie was manipulating under the porch because his view from the street was obscured.

Taking all four factors into consideration, we conclude that the porch and side yard area at the residence were part of the home's curtilage and thus entitled to Fourth Amendment and art. 14 protections against an unreasonable search and seizure. We emphasize the relevance of the Dunn factors for our courts in determining whether a challenged police action occurring within the boundaries of a home, which under the Fourth Amendment is expressly designated as a "constitutionally protected area," is compliant with its protections. Application of the Dunn factors in appropriate cases follows Jardines, eschewing the "reasonable expectation of privacy" inquiry that is deemed necessary only

when the issue is whether the area is a "constitutionally protected area." Thus, because Detective Griffin's search was a physical intrusion into the constitutionally protected area of the residence, Price and by extension Leslie are relieved of the burden to show that Price had a reasonable expectation of privacy in the area searched. See Jardines, 133 S. Ct. at 1417, citing United States v. Jones, 565 U.S. 400, 408-409 (2012) (reasonable expectation of privacy test "is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas"). "That the officers learned what they learned only by physically intruding on [Price's] property to gather evidence is enough to establish that a search occurred." Jardines, supra.

b. Police officer's physical intrusion into curtilage. Because we have determined that Detective Griffin entered into a constitutionally protected area, "we turn to the question of whether it was accomplished through an unlicensed physical intrusion." Jardines, 133 S. Ct. at 1415. If so, the intrusion amounts to a search that must be justified by probable cause and a warrant or exigent circumstances. See id. at 1413.

As the Court explained in Jardines, a police officer, like any other citizen, has an implied license to walk up the path to the front door of a home and knock on the front door. That license, however, is limited in scope, purpose, and duration.

See id. at 1415-1416.  Here, Detective Griffin and the other officers were entitled to open the front gate, walk up the path and onto the porch, and engage Price and his guests in conversation.  In veering off the path and venturing into the side yard of the home for the purpose of conducting a search for the weapon, Detective Griffin engaged in the precise conduct that Jardines found offensive to the Fourth Amendment.  See id. at 1416 ("the background social norms that invite a visitor to the front door do not invite him there to conduct a search").  Just as the police officers in Jardines exceeded the scope of their license when they used a drug-sniffing dog to search the front porch, here Detective Griffin had neither express nor implied license to search the side yard and porch area.  See id. at 1417 ("their behavior objectively reveals a purpose to conduct a search, which is not what anyone would think he had license to do").  We conclude, therefore, that Detective Griffin's unlicensed physical intrusion into the curtilage of the defendant's home was a search for constitutional purposes.

3.  Probable cause and exigent circumstances.  Having determined that a constitutional search occurred, we briefly address the Commonwealth's argument, raised for the first time on appeal, that Detective Griffin demonstrated probable cause and exigent circumstances to justify the warrantless search.  Although the motion judge noted in passing that the evidence in

this case failed to show probable cause or exigent circumstances, we decline to address the Commonwealth's claim of error in that finding on the merits. The Commonwealth failed to raise this argument below, and therefore it is waived.[13] "[I]t is rare for us to consider an argument for reversal of a lower court which is first raised on appeal and is dispositive in favor of the party belatedly raising the issue." Commonwealth v. Bettencourt, 447 Mass. 631, 633 (2006), quoting Commonwealth v. Morrissey, 422 Mass. 1, 4 n.5 (1996).

Conclusion. Because we conclude that the sawed-off shotgun was recovered as a result of an unlawful physical intrusion into the curtilage of the residence, and therefore in violation of the warrant requirement of the Fourth Amendment and art. 14, the allowance of the defendants' motions to suppress is affirmed.

So ordered.

---

[13] The Commonwealth similarly failed to raise the argument that the search could be justified by reasonable suspicion below. This argument is without merit. The Commonwealth's citations to Terry-type frisk cases are inapposite. See Terry v. Ohio, 392 U.S. 1, 21-22 (1968). Our laws do not recognize an exception to the warrant requirement based solely on reasonable suspicion, nor do we recognize a legal basis to "frisk" a private residence without a warrant. "Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant." Coolidge v. New Hampshire, 403 U.S. 443, 451 (1971), quoting Agnello v. United States, 269 U.S. 20, 33 (1925).