NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12465

COMMONWEALTH  vs.  JEAN ALEXIS.


Essex.      September 5, 2018. - December 14, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.


Constitutional Law, Search and seizure.  Search and Seizure,
    Exigent circumstances, Warrant, Probable cause.  Practice,
    Criminal, Motion to suppress, Warrant, Waiver.  Probable
    Cause.



Indictments found and returned in the Superior Court
Department on June 27, 2016.

A pretrial motion to suppress evidence was heard by James
F. Lang, J.

An application for leave to prosecute an interlocutory
appeal was allowed by Kafker, J., in the Supreme Judicial Court
for the county of Suffolk, and the appeal was reported by him.


Emily R. Mello, Assistant District Attorney, for the
Commonwealth.
Emily A. Cardy, Committee for Public Counsel Services, for
the defendant.

CYPHER, J.  The defendant, Jean Alexis, was charged with numerous crimes stemming from an armed home invasion in Lynn.[1] The day after the home invasion, and following an investigation, the police arrested the defendant inside his dwelling without an arrest warrant.  The defendant moved to suppress evidence that (1) the police observed during a protective sweep of his dwelling after he was arrested and (2) the police gathered after they obtained a warrant to search his dwelling.[2]  A judge in the Superior Court allowed the defendant's motion to suppress because the police created the exigency that prompted their warrantless entry into the defendant's dwelling.  A single justice of this court allowed the Commonwealth's application for leave to pursue an interlocutory appeal and reported the case to the full court.

---

[1] The charges are as follows:  home invasion (G. L. c. 265, § 18C), armed robbery (G. L. c. 265, § 17), armed assault in a dwelling (G. L. c. 265, § 18A), assault and battery by means of a dangerous weapon (G. L. c. 265, § 15A [b]), assault and battery (G. L. c. 265, § 13A [a]), and possession of an electrical stun gun (G. L. c. 140, § 131J).

[2] "An arrest warrant 'encompasses the power to enter a [suspect's] residence for the purpose of executing the warrant'" (citation omitted).  Commonwealth v. Silva, 440 Mass. 772, 776 (2004).  "Generally, a [search] warrant must be secured before a search [of the dwelling] is conducted, and warrantless searches 'are presumptively unreasonable.'"  Commonwealth v. Ramos, 470 Mass. 740, 745 (2015), quoting Kentucky v. King, 563 U.S. 452, 459 (2011).

We have held that "where the exigency is reasonably foreseeable and the police offer no justifiable excuse for their prior delay in obtaining a warrant, the exigency exception to the warrant requirement is not open to them."  Commonwealth v. Forde, 367 Mass. 798, 803 (1975) (analyzing warrantless search under Fourth Amendment to United States Constitution).  See Commonwealth v. Molina, 439 Mass. 206, 211 (2003).  In Kentucky v. King, 563 U.S. 452, 462 (2011), the United States Supreme Court held that where "the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed."  The Commonwealth urges us to follow the jurisprudence of the Supreme Court when examining a warrantless search of a dwelling under art. 14 of the Massachusetts Declaration of Rights.  Adopting such an approach would render all of the evidence obtained after the defendant's arrest admissible.  The defendant argues that, notwithstanding the Supreme Court's decision in King, under art. 14 the police cannot create the exigent circumstances used to justify a warrantless entry to a home, even if they engaged in lawful action, such as approaching a house to knock on a door. He also contends that the Commonwealth waived the argument that probable cause remained for the subsequent search warrant, even

if the impermissibly viewed evidence is redacted from the affidavit.

We interpret art. 14 to provide greater protection than the Fourth Amendment where the police have relied on a reasonably foreseeable exigency to justify the warrantless entry into a dwelling. Therefore, we conclude that the judge did not err in allowing the defendant's motion to suppress evidence that was found in plain view during a protective sweep because the officers' entry into his home was not justified based on exigent circumstances. We also conclude that the Commonwealth waived the argument regarding whether, if the impermissible observations from the affidavit were redacted, the search warrant was based on probable cause.

Background. We recite the motion judge's factual findings supplemented by the uncontroverted evidence at the motion hearing that is consistent with the judge's findings. Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015). "[O]ur duty is to make an independent determination of the correctness of the [motion] judge's application of constitutional principles to the facts as found" (citation omitted). Commonwealth v. Campbell, 475 Mass. 611, 615 (2016). On the morning of June 14, 2016, Lynn police officers responded to a report of a home invasion. Shortly thereafter, Detective Stephen Pohle arrived at the scene. Upon arrival, Pohle spoke

with the victim, Shomar Garcia, who lived at the apartment with his wife and two children.  Garcia conveyed that earlier that morning, while he was leaving for work, three African-American males forced their way into the apartment, one of them struck him in the face with a silver handgun, and they "forced their way into the bedroom, where his wife and two children were." The men restrained Garcia with duct tape and took his jewelry and wallet.  Before leaving the house, the man with the silver handgun struck Garcia's six month old baby in the face with the gun.

Garcia recognized the man with the silver handgun as someone with whom he had attended high school.  Later that afternoon, Garcia went to the police station in an attempt to identify the perpetrator.  After looking through a "few hundred photos," Garcia saw a photograph of the defendant and stated with "[one hundred] percent" certainty that the photograph was of one of the men who had broken into his home and was the one who had hit him and his baby.

Pohle wrote an incident report and filled out an arrest warrant application.  Because it was late in the afternoon and his shift had ended, Pohle placed the warrant in the "court box"

for the next day.[3]  Pohle testified that although the nature of the investigation -- an armed home invasion -- justified an after-hours warrant, the decision not to seek one was within his discretion.[4]

Early the next morning, before he began his shift, Pohle telephoned the supervisor of the Lynn police department's warrant task force, Sergeant Michael Kenny.  Pohle informed Kenny, who was on his way to the police station, that the defendant had been identified as the perpetrator of the home invasion who brandished a handgun and struck the baby with the gun.  Pohle also informed Kenny that he was in the process of getting an arrest warrant.

At approximately 7 A.M., Kenny arrived at the police station and reviewed the department's "hot sheet."[5]  Kenny recognized the defendant's name on the "hot sheet" as a person

---

[3] The "court box" has a mail slot for "paperwork that needs to go over to court."  Each morning, a "police prosecutor" brings applications for warrants and complaints from the police station to the Lynn Division of the District Court Department, where a clerk reviews and signs the applications.

[4] Detective Stephen Pohle did not recall his rationale for not seeking an after-hours arrest warrant.

[5] A "hot sheet" has "information that's put out to police officers within the department that explains incidents, what happened, the facts of incidents, [and] suspect information." The "hot sheet" "pass[es] on information" to "officers who may have not worked [the previous] shift."

with whom he had recently spoken while investigating another matter.  Kenny also knew where the defendant lived.

Without an arrest warrant, but believing that there was probable cause to arrest the defendant and that exigent circumstances existed, Kenny and four other members of the warrant task force proceeded to the defendant's address.  The officers were dressed in plainclothes and had their badges displayed.[6]  Because of the information available to Kenny at the time -- the defendant's identification being fresh, the violent nature of the home invasion, the defendant's role in it, his possession of a firearm, the involvement of two accomplices, and the possibility that they might flee -- he believed that immediate action was required.[7]

Upon arriving at the defendant's address, Kenny and two officers approached the front door, while two other officers went to the side of the house to secure a perimeter.[8]  Kenny

---

[6] The officers arrived at the defendant's residence in unmarked police vehicles.

[7] The motion judge found that Sergeant Michael Kenny mistakenly believed that the defendant's identification had occurred that morning, immediately prior to Pohle's telephone call.  Testimony in the record indicates that Garcia had identified the defendant the previous day.

[8] Kenny described the dwelling as a "four-room rooming house" that "looks like a single-family house from the front." "There's a porch that goes up to the front door," and the front door is "clear glass."  "To the left and right of [the] door are

understood that the officers' presence might prompt the defendant to flee or destroy evidence. Kenny's plan was to knock on the door to determine if the defendant was home, question him, and, if the opportunity arose, arrest him. As Kenny ascended the front porch steps, the defendant saw the officers through the glass front door. The defendant turned around and ran toward the back of the house. One of the officers who was setting up a perimeter observed the defendant climbing through a window in the back of the house. The officer shouted at the defendant to show his hands. Instead, the defendant retreated into the house, out of the officer's view. Because of the volatile situation and the nature of the crimes involved, the officers forced their way through the front door. As they entered, they noticed the defendant coming toward them from the back of the home. The officers ordered the defendant to the ground and handcuffed him in the hallway.

After the defendant had been restrained, the officers conducted a protective sweep of the house and secured the premises. During the protective sweep, Kenny made a plain view

---

windows, and the windows are to each separate room in the rooming house." "When you walk in the front door, to the right is a door that goes to a bedroom," and "[o]n the left, is another door that goes to a bedroom." "There is an open living room area, and . . . behind that is a kitchen area [with] stairs on the right . . . going to the second level."

observation of some jewelry on top of a refrigerator in the defendant's room that matched the description of the jewelry taken during the home invasion.[9]

After the dwelling had been secured, Kenny prepared an application for a search warrant. In his affidavit, Kenny relayed Garcia's account of the violent home invasion, Garcia's identification of the defendant, and that the defendant was brandishing a silver handgun. He also included the plain view observations of the suspected stolen property he had seen during the protective sweep. A clerk-magistrate of the Lynn Division of the District Court Department approved the search warrant.

During the execution of the search warrant, the officers seized items of evidentiary significance, including jewelry, a wallet, an electrical stun gun, and various identification cards bearing the defendant's name. Also discovered were articles of clothing that matched the description given by Garcia of the clothes worn by the home invaders. Following the search warrant execution, Garcia confirmed that the sweatshirt and the pants were consistent with the clothing worn by the defendant during the home invasion.

Discussion. 1. Warrantless arrest. Historically, the Massachusetts Constitution has carefully protected the home from

---

[9] A description of the jewelry that had been taken from Garcia was in Pohle's incident report.

the intrusion by the government without a warrant, with certain delineated exceptions.  See Commonwealth v. Tyree, 455 Mass. 676, 684 (2010); Molina, 439 Mass. at 211.  The existence of exigent circumstances that make it impracticable to obtain a warrant is one such exception.  Commonwealth v. Figueroa, 468 Mass. 204, 213 (2014).[10]

The Commonwealth argues that the warrantless arrest of the defendant in his home was justified because the defendant's reaction to the lawful police presence outside his home created exigent circumstances.  In making this argument, it maintains that the United States Supreme Court, in King, 563 U.S. at 469, abrogated prevailing Massachusetts jurisprudence when it held that "the exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment."  In other words, if the conduct of the police before their entry into the apartment was

---

[10] Police may have reasonable grounds to believe that obtaining a warrant would be impracticable when the delay in doing so would pose a significant risk that the suspect may flee, evidence may be destroyed, or the safety of the police or others may be endangered.  Commonwealth v. Figueroa, 468 Mass. 204, 213 (2014).  Although often used interchangeably in the cases, "impractical" is not "impracticable."  See J.A. Grasso, Jr., & C.M. McEvoy, Suppression Matters Under Massachusetts Law § 14-1[c][2] (2018).  Webster's Third New International Dictionary 1136 (1963) defines "impractical" as "not wise to put into or keep in practice or effect," while "impracticable" is defined as "incapable of being performed or accomplished by the means employed or at command," id.

entirely lawful, the exigent circumstances exception applies.
Id.

The defendant contends that the exigent circumstances
exception to the warrant requirement is inapplicable because the
police created the exigency themselves by not procuring a
warrant before going to the defendant's residence.  He claims
that the warrantless entry into his home violates his rights
under art. 14, notwithstanding the fact that police officers may
lawfully knock on a door and make inquiries.[11]

The Fourth Amendment and art. 14 require that all searches
and seizures be reasonable, and case law has held that all
warrantless entries into a home are presumptively unreasonable.
See, e.g., Commonwealth v. Ramos, 470 Mass. 740, 744-745 (2015);
Commonwealth v. Polanco, 92 Mass. App. Ct. 764, 769 (2018).
Because the touchstone of the Fourth Amendment is
reasonableness, however, "the warrant requirement is subject to

---

[11] For the first time on appeal, the defendant contends that
the officers' presence on his porch violated his rights under
the Fourth Amendment to the United States Constitution and art.
14 of the Massachusetts Declaration of Rights.  This argument is
misplaced.  Neither the Federal nor the Massachusetts
Constitution prohibits police from knocking on a citizen's door
and making an initial inquiry.  See Commonwealth v. Leslie, 477
Mass. 48, 57 (2017) ("a police officer, like any other citizen,
has an implied license to walk up the path to the front door of
a home and knock on the front door").  Contrast Collins v.
Virginia, 138 S. Ct. 1663, 1675 (2018) (Fourth Amendment does
not permit police officer, uninvited and without search warrant,
to enter curtilage of home to search vehicle).

certain reasonable exceptions." Ramos, supra at 745, quoting King, 563 U.S. at 459. The Commonwealth may justify a warrantless entry into a home if the police had probable cause and exigent circumstances. Molina, 439 Mass. at 209. Under the exigent circumstances exception to the warrant requirement, "there must be a showing that it was impracticable for the police to obtain a warrant, and the standards as to exigency are strict." Forde, 367 Mass. at 800.

In Forde, we held that "a warrantless entry into a dwelling to arrest in the absence of sufficient justification for the failure to obtain a warrant" is impermissible. Id. at 806. We concluded that "where the exigency is reasonably foreseeable and the police offer no justifiable excuse for their prior delay in obtaining a warrant, the exigency exception to the warrant requirement is not open to them." Id. at 803. Forde was decided solely on the basis of the Fourth Amendment. Id. at 805-806.

Later, in Molina, a case decided eight years before the Supreme Court's decision in King, we held: "The Fourth Amendment . . . and art. 14 . . . scrupulously guard against the intrusion of the government into a citizen's home without a warrant." Molina, 439 Mass. at 211. We stated that "[t]he exigent circumstance requirement is not satisfied by virtue of altercations resulting from a warrantless arrest at the home,

where there is no showing of exigent circumstances leading to the warrantless arrest itself."  Id.

In King, 563 U.S. at 462, the Supreme Court held that where "the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed."  In an eight-to-one decision, the Court concluded that as long as "the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment," they may knock on a suspect's door and announce their presence, and the exigent circumstances rule may still apply.  Id. at 469.  See Commonwealth v. Gentle, 80 Mass. App. Ct. 243, 249 (2011).  "Molina and King thus appear inconsistent with each other as a matter of Fourth Amendment jurisprudence."  Gentle, supra at 251.  Our interpretation of the Fourth Amendment tracked that of the dissent in King.  As the sole dissenter, Justice Ginsberg reasoned, "How 'secure' do our homes remain if police, armed with no warrant, can pound on doors at will and, on hearing sounds indicative of things moving, forcibly enter and search for evidence of unlawful activity?"  King, supra at 475 (Ginsburg, J., dissenting).

In Molina, we did not address whether art. 14 offers more protection than the Fourth Amendment in situations where, as

here, law enforcement's lawful conduct created the exigent circumstances that are in turn used to justify a warrantless search.  We take the opportunity to address this issue now.

Our interpretation of art. 14 frequently aligns with the United States Supreme Court's interpretation of the Fourth Amendment.  However, we have sometimes held that art. 14 may provide more substantive protection to individuals than that provided by the Fourth Amendment.[12]  See, e.g., Commonwealth v. Amado, 474 Mass. 147, 154 (2016) ("'probable cause [(not reasonable suspicion)] is the appropriate standard that must be met for a strip or visual body cavity search to be constitutionally permissible' under art. 14" [citation omitted]); Commonwealth v. Balicki, 436 Mass. 1, 9 (2002) (declining to abandon inadvertence requirement of plain view

---

[12] See Commonwealth v. Gentle, 80 Mass. App. Ct. 243, 250 (2011); Cordy, Criminal Procedure and the Massachusetts Constitution, 45 New Eng. L. Rev. 815, 821 (2011) ("the [Supreme Judicial Court] has repeatedly concluded that [art.] 14's protections against unreasonable searches and seizures are broader and more restrictive of police power than those of the Fourth Amendment"); Grasso, "John Adams Made Me Do It": Judicial Federalism, Judicial Chauvinism, and Article 14 of Massachusetts' Declaration of Rights, 77 Miss. L.J. 315, 340 (2007) ("the [Supreme Judicial Court] has often recognized its authority and duty to interpret and enforce cognate provisions of the Massachusetts Constitution that afford greater protections than its federal counterpart"); Wilkins, The Massachusetts Constitution -- The Last Thirty Years, 44 Suffolk U. L. Rev. 331, 337 (2011) ("In the past three decades, the Supreme Judicial Court has resisted urgings to relax the requirements of art. 14 to conform to the Supreme Court's revisions of Fourth Amendment law" [footnotes omitted]).

exception to warrant requirement under art. 14, as Supreme Court did under Fourth Amendment); Commonwealth v. Gonsalves, 429 Mass. 658, 668 (1999) ("under art. 14, the balancing of interests requires that Massachusetts citizens should not be subjected to unjustified exit orders during routine traffic stops"); Commonwealth v. Upton, 394 Mass. 363, 373-375 (1985) (retaining more stringent test under Aguilar v. Texas, 378 U.S. 108 [1964], and Spinelli v. United States, 393 U.S. 410 [1969], rather than totality of circumstances standard); Gentle, 80 Mass. App. Ct. at 250 ("Although the Supreme Judicial Court's interpretation of art. 14 has often converged with the United States Supreme Court's interpretation of the Fourth Amendment, when the Supreme Judicial Court has diverged it has emphasized its obligation to undertake an independent review of the State Constitution and the court's freedom to interpret the State Constitution to provide a different balancing of the interests of privacy and the police . . .").

Although we have not specifically answered the question whether art. 14 provides greater protection than the Fourth Amendment in these circumstances, we have repeatedly emphasized the importance of a person's right to privacy in the home. See, e.g., Commonwealth v. Porter P., 456 Mass. 254, 260 (2010) ("In view of the 'sanctity of the home,' 'all details [in the home] are intimate details, because the entire area is held safe from

prying government eyes'" [citation omitted]); Molina, 439 Mass. at 209; Balicki, 436 Mass. at 12 n.14 ("Nowhere are expectations of privacy greater than in the home, and '[i]n the home . . . all details are intimate details" [citation omitted]); Commonwealth v. Marquez, 434 Mass. 370, 374 (2001); Commonwealth v. Straw, 422 Mass. 756, 760 (1996) ("it is in the home that a person's expectation of privacy is at its highest"); Commonwealth v. Blood, 400 Mass. 61, 68 & n.9 (1987) (art. 14 affords greater privacy protection from government eavesdropping for conversations that occur in home); Forde, 367 Mass. at 805 ("The right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one's privacy").

In the present case, balancing the interests of law enforcement with the rights of people to be protected from warrantless searches in the home, we conclude that art. 14 provides greater protection than the Fourth Amendment in these circumstances and that under art. 14 the police cannot avail themselves of the exigency exception to the warrant requirement when it was foreseeable that their actions would create the exigency, even if their conduct was lawful. See Molina, 439 Mass. at 210; Forde, 367 Mass. at 803.

Here, before arriving at the defendant's home, Kenny knew that Pohle was in the process of getting an arrest warrant but

had not secured one.  Moreover, Kenny testified that his plan was to knock on the door to see if the defendant was home, question him, and if the opportunity arose, arrest him.  Based on his testimony, it was evident that Kenny went to the defendant's home with the purpose of making an arrest without a warrant.  There is nothing in the record indicating that it was impracticable to get a warrant.

Likewise, it was reasonably foreseeable that the five police officers approaching the defendant's home could cause the defendant to attempt to flee.[13]  In fact, Kenny testified that he understood that the officers' presence might prompt the defendant to flee or destroy evidence.  See Forde, 367 Mass. at 801.  The officers also set up a perimeter around the house to prevent the defendant from discarding evidence or escaping.

There is no question that the police had developed probable cause to arrest the defendant prior to arriving at his home. Pohle decided not to pursue an after-hours arrest warrant, even though he testified that there was a procedure in place to get one.  There is also no question that it is generally permissible for police to approach a person's home and knock on the door. Commonwealth v. Leslie, 477 Mass. 48, 57 (2017).  However, Kenny had the opportunity to obtain an arrest warrant the morning of

---

[13] Although the officers were in plain clothes, Kenny testified that their badges were displayed.

the arrest.  Forgoing multiple opportunities to procure an arrest warrant further highlights the unreasonableness of the arrest.  See Forde, 367 Mass. at 799, 801.

Furthermore, the Commonwealth made no showing that it was impracticable to obtain an arrest warrant.  There was no evidence that there was a risk that the defendant would flee, destroy evidence, or be a risk to the officers' safety if the police followed the normal course and secured a warrant.  See Tyree, 455 Mass. at 687-691.  Compare Figueroa, 468 Mass. at 213.  The crime occurred the previous day, and there was no evidence that the defendant even knew or had reason to know that he was a suspect before the police arrived at his home.  Compare Commonwealth v. Colon, 449 Mass. 207, 217, cert. denied, 552 U.S. 1079 (2007) (exigent circumstances existed where witnesses to shooting told police that shooters had run into building and officers knocked on door and received no answer notwithstanding noises coming from apartment).

The Commonwealth argues that because of the nature of the crime, the defendant's role in it, his possession of a firearm, the involvement of two accomplices, and the possibility that they might try to flee, the situation called for immediate action.  However, the police could have set up surveillance while they waited for the warrant and arrested the defendant if he left his house.  To this point, even though the Commonwealth

argued that the defendant might have fled, it did not articulate any basis to conclude that there was a risk of flight. See Tyree, 455 Mass. at 689 ("the police had no reason to believe that the suspects were likely to flee the residence in the time it would have taken to procure a warrant to search the premises"); Molina, 439 Mass. at 210. As in Molina, supra at 211, "[t]his is a situation where the officers could have, and should have, secured a warrant. . . . The exigent circumstances that emerged during the arrest were a result of the officers' appearance at the dwelling." Considering all of the circumstances, the arrest of the defendant in his dwelling without a warrant was unreasonable. Because the defendant's warrantless arrest in his apartment was unlawful, the police cannot rely on the plain view doctrine to allow the postarrest observations in evidence. Forde, 367 Mass. at 807.

2. Waiver. In a postargument letter invited by the court, the defendant contends that the Commonwealth waived any argument regarding the validity of the search warrant that was sought and executed after the defendant was arrested because the argument was raised neither below nor on appeal. We agree. See Commonwealth v. Bettencourt, 447 Mass. 631, 634 (2006) ("Our system is premised on appellate review of that which was presented and argued below"). Contrast Commonwealth v. Perkins, 478 Mass. 97, 107 (2017). Nevertheless, we take this

opportunity to discuss the nexus requirement to issue a search warrant for a dwelling.

Under both the Fourth Amendment and art. 14, a search warrant may issue only on a showing of probable cause. Commonwealth v. Keown, 478 Mass. 232, 237 (2017), cert. denied, 138 S. Ct. 1038 (2018).  Probable cause means a "substantial basis" to conclude that "the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues" (citation omitted). Commonwealth v. Holley, 478 Mass. 508, 521 (2017).  "Information establishing that a person is guilty of a crime does not necessarily constitute probable cause to search the person's residence."  Commonwealth v. Cinelli, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983).  There must be probable cause to conclude not only that an individual committed a crime, but also that there is a nexus between the crime and the items sought, and the location to be searched.  The nexus to search a residence for evidence of a crime "may be found in the type of crime, the nature of the . . . items [sought], the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide [items of the sort sought]" (quotation and citation omitted).  Id.  See Perkins, 478 Mass. at 104.

Some cases involving the search of a dwelling have used an articulation of the nexus standard that has sometimes been interpreted as being more stringent, particularly in cases involving searches of residences for drugs.  See, e.g., Perkins, 478 Mass. at 104; Commonwealth v. Colondres, 471 Mass. 192, 201, cert. denied, 136 S. Ct. 347 (2015); Commonwealth v. Tapia, 463 Mass. 721, 725-726 (2012); Commonwealth v. Escalera, 462 Mass. 636, 644-646 (2012); Commonwealth v. Pina, 453 Mass. 438, 440-441 (2009).  In one of those cases we stated:  "The affidavit need not convince the magistrate beyond a reasonable doubt, but must provide a substantial basis for concluding that [drugs or instrumentalities of the drug trade] will be found on the specified premises."  Pina, supra, quoting Commonwealth v. Donahue, 430 Mass. 710, 712 (2000).  A "substantial basis" means no more and no less than that "[a]n affidavit must contain enough information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues."  Cinelli, 389 Mass. at 213.  "In determining whether an affidavit justifies a finding of probable cause, the affidavit is considered as a whole and in a commonsense and realistic fashion" (citation omitted).  Commonwealth v. Robertson, 480 Mass. 383, 386 (2018).

The affidavit in support of the search warrant stated that the defendant was identified by the victim, was seen brandishing a silver handgun, and struck Garcia and his baby during the home invasion with the gun. The affidavit also stated that Kenny observed jewelry fitting the description of stolen jewelry during the protective sweep. The search warrant was approved by a clerk-magistrate, and the police seized significant evidence, including articles of clothing that matched Garcia's description of the clothes worn by the home invaders.

Here, probable cause to issue the search warrant remained even without considering Kenny's plain view observation of jewelry matching the description of the stolen jewelry. The defendant used a handgun to strike Garcia and his child during the commission of the home invasion.[14] It is reasonable to expect that the handgun specified in the warrant was an item that could reasonably be located in the home of a person who had participated in an armed home invasion the previous day. Cinelli, 389 Mass. at 212-213. See Commonwealth v. Luthy, 69 Mass. App. Ct. 102, 105 (2007) ("The connection between the items to be seized and the place to be searched does not have to be based on direct observations; it may be found by looking at the type of crime, nature of the items, the suspect's

_____

[14] The defendant did not fire the handgun during the home invasion.

opportunity to conceal items, and inferences as to where the items are likely to be hidden").  In Commonwealth v. James, 424 Mass. 770, 778 (1997), we held that the defendants had no reason to dispose of the instrumentalities used in a murder -- knives, sneakers, and a face mask -- because the defendants were unaware that they were suspects and "all of [the] items [were] durable, of continuing utility to the defendants, and it was reasonable to expect that they would be kept at home, particularly as they are not inherently incriminating to possess."  We noted, however, that a defendant who has fired a handgun in the commission of a murder "would not keep at home an incriminating handgun which could be readily identified as the murder weapon through ballistics tests."  Id. at 778 n.15.  The defendant here did not fire his firearm, but used it to strike Garcia and his baby.  That a person would keep a handgun that was not vulnerable to ballistic testing in his or her home is not a remarkable proposition.  See United States v. Cowling, 648 F.3d 690, 696 (8th Cir. 2011), cert. denied, 566 U.S. 940 (2012) ("people generally keep [firearms] at home or on their persons" [quotation and citation omitted]); United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993) (firearms are "the type[] of evidence likely to be kept in a suspect's residence").  The fact that the handgun was ultimately not discovered is of no consequence.  Had the argument been preserved, it is likely that

the evidence seized as a result of the search would not have been suppressed.

Conclusion.  The order of the Superior Court judge allowing the defendant's pretrial motion to suppress evidence is affirmed.

So ordered.