The defendant appeals from his convictions, after a jury trial, of distribution of heroin, as a subsequent offense, G. L. c. 94C, § 32 (b ) ; possession with intent to distribute heroin, as a subsequent offense, G. L. c. 94C, § 32 (b ) ; and possession with intent to distribute cocaine, as a subsequent offense, G. L. c. 94C, § 32A (c ) - (d ). He raises two main arguments on appeal. First, he contends that the fifty bags of heroin seized from under a piece of carpet in an area outside a multifamily residential building should have been suppressed because they were within the curtilage of the home. Second, he contends that certain evidentiary rulings unfairly curtailed his misidentification defense. We affirm.
1. Motion to suppress. The trial judge, after an evidentiary hearing, denied the defendant's motion to suppress evidence recovered from his person, from third parties, and the fifty packets of heroin found under the carpet. The only aspect of the suppression decision the defendant now challenges on appeal concerns the fifty packets. "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error ...." Commonwealth v. Fernandez, 458 Mass. 137, 142 (2010), quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004). "However, '[w]e review independently the application of constitutional principles to the facts found.' " Commonwealth v. Warren, 475 Mass. 530, 534 (2016), quoting Commonwealth v. Wilson, 441 Mass. 390, 393 (2004). "Where, as here, the issue is whether a search occurred within the curtilage of a home, 'we undertake our independent review cognizant that there is no "finely tuned formula" that demarcates the curtilage in a given case.' " Commonwealth v. Leslie, 477 Mass. 48, 53 (2017), quoting Fernandez, supra.
Our recitation of the facts is drawn from Detective Bruno's testimony at the suppression hearing, which the judge adopted in its entirety as his findings, and from the photographs admitted during the suppression hearing. Bruno is a detective in the Springfield police department's narcotics bureau with sixteen years of experience in narcotics distribution operations.
The defendant does not live at 51-69 Orchard Street,[2] which is a multifamily building consisting of several side-by-side residential units. On January 21, 2016, the property on which the building was located was surrounded either by fencing or shrubs. However, the fencing was not uninterrupted; instead, some portions of the fence were broken down, creating two to three foot gaps. These apertures were large enough to permit people to walk onto the property without having to step over fencing. Separate from the fencing around the property as a whole, each unit had an individual fenced-in section of outdoor space associated with that particular unit. The land outside each of these fenced-in areas is an untended common grass and dirt area not associated with any particular unit, and has a common walkway leading to the various units of the building.
Area residents had made several complaints about criminal activity occurring in the rear area of 51-69 Orchard Street. On January 21, 2016, Bruno, stationed in a vehicle in an adjacent parking lot, had a clear view of the outdoor dirt and grass common area of the property through the gaps in the fence. Bruno saw that a piece of carpet was placed on this common area, outside the fenced-in areas associated with individual units.
Using binoculars, Bruno observed the defendant in concert with two others engaged in the following pattern of behavior. Someone (purchaser) would arrive at the property and speak to one of the defendant's coparticipants, who was posted at the fence line. The latter would then direct the purchaser to the defendant, who was stationed by the carpet in that common area. The purchaser would hand the defendant money. The defendant would then retrieve a small white item from underneath the piece of carpet and hand it to the purchaser. Bruno observed this sequence of events happen fifteen to twenty times over a period of twenty-five minutes. In Bruno's view, based on his training and experience, these activities were consistent with the sale of narcotics.
Eventually, Bruno relayed a description of one of the purchasers to other officers who were stationed nearby. When stopped, that purchaser had in his possession an empty heroin packet labeled with a "dead zone" logo. Later, Bruno relayed the descriptions of two additional purchasers who were then also apprehended. Those two had five heroin packets with the "dead zone" logo.
Shortly thereafter, several people arrived on bicycles and alerted the defendant and his two coparticipants to the police presence. One of the coparticipants began sweeping around the area of the carpet. The defendant walked away, but was apprehended by other officers toward the front of the building. Bruno thereafter lifted the carpet and found fifty packets of heroin underneath it.
Relying heavily on Leslie, 477 Mass. at 53-57, the defendant argues that the carpet was located within the curtilage of the multifamily residence and, therefore, the police could not search it without a warrant. Whether a particular location is within a home's curtilage is a mixed question of law and fact for which the defendant bears the burden of proof. The inquiry turns on whether the particular area is "immediately surrounding and associated with the home ... as 'part of the home itself for Fourth Amendment [to the United States Constitution] purposes.' " Florida v. Jardines, 569 U.S. 1, 6 (2013), quoting Oliver v. United States, 466 U.S. 170, 180 (1984). See Fernandez, 458 Mass. at 145. To determine whether a particular area searched is within a home's curtilage, we follow the four-factor test used in United States v. Dunn, 480 U.S. 294, 301 (1987) : "(i) 'the proximity of the area claimed to be the curtilage to the home'; (ii) 'whether the area is included within an enclosure surrounding the home'; (iii) 'the nature of the uses to which the area is put'; and (iv) 'the steps taken by the resident to protect the area from observation by people passing by.' " Leslie, 477 Mass. at 55, quoting Dunn, 480 U.S. at 301. If a particular spot is located within the curtilage, then it enjoys protection "as part of the home itself." Jardines, 569 U.S. at 6, quoting Oliver, 466 U.S. at 180. "Although the curtilage is an area to which the private activities of the home extend, all police observation of the curtilage is not necessarily barred by the Fourth Amendment.... 'The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.' " Florida v. Riley, 488 U.S. 445, 452-453 (1989) (O'Connor, concurring), quoting California v. Ciraolo, 476 U.S. 207, 213 (1986).
Applying the four-factor Dunn test to the facts as the judge found them, we see no error in the judge's conclusion that the defendant failed to establish that the carpet was located within the curtilage of the building. Although it is true that the rug was located on the building's outdoor common area that was largely enclosed by fencing, the fencing had significant gaps that permitted free movement onto, and observation into, that common area. These "cut-through avenues" (as they were described) were used to cross into the common area from the street and driveways, and to travel between the streets that bordered the property to the north and south. The fence was, in short, a visually and physically permeable barrier. Likewise, although it is also true that the common area was adjacent to the enclosed individual areas associated with each unit, it was separated from those zones by fencing that is easily understood as demarcating private versus public spaces within the residential complex. Moreover, the common nature of the area, together with its apparent purpose to provide communal access to the various units in the building, as well as its open, untended aspect, belie any suggestion that it was associated with any particular unit. There was no evidence showing how, if at all, the residents of the building used the outdoor common area. By contrast, there was a history of using the area for criminal purposes -- itself an indication that it was not intimately tied to the activities of a home -- and it was in fact being used for such purposes by, no less, the defendant, who had no apparent connection to the property and thus stood in relation to it on the same footing as a member of the public. For these reasons, we conclude that the defendant did not meet his burden of proving that the piece of carpet was located within the curtilage.
The defendant's argument that he had a constitutionally-protected reasonable expectation of privacy in the area of the carpet also fails. To determine whether the defendant had a reasonable expectation of privacy in the area of the carpet, this court considers "a number of factors, including ... whether the defendant owned the place involved; whether the defendant controlled access to the area; and whether the area was freely accessible to others.... [A]n individual can have only a very limited expectation of privacy with respect to an area used routinely by others" (citations and quotations omitted). Commonwealth v. Colon, 449 Mass. 207, 213-214 (2007). As should be evident from the facts we have recited, the defendant did not have a reasonable expectation of privacy either in the common area or in the carpet. The judge found that the defendant did not live at the apartment complex and there was no evidence that he had a possessory interest in the piece of carpet. See Commonwealth v. Duncan, 71 Mass. App. Ct. 150, 156 (2008). Even if one of the building's residents had an expectation of privacy in the common area or in the piece of carpet, that expectation would not transfer to a trespassing defendant engaged in criminal activity against the wishes of the residents of the building. See Commonwealth v. Carter, 424 Mass. 409, 412 (1997) ("Article 14 [of the Massachusetts Declaration of Rights] does not relieve a defendant who unlawfully intruded on someone else's reasonable expectation of privacy from establishing that he had a reasonable expectation of privacy himself"). The evidence did not suggest that the defendant controlled access to the common area. See Commonwealth v. McCarthy, 428 Mass. 871, 875 (1999), quoting United States v. Dunn, 480 U.S. at 300 (finding enclosed parking lot with no internal barriers routinely used by wide range of tenants and nontenants did not "give tenants any reasonable expectation that it would be 'treated as the home itself' "). The fact that one of his coparticipants acted as a gatekeeper of a sort with respect to purchasers, is not the same as controlling access over the common area outside of a building in which there was no evidence they lived for purposes of establishing a privacy interest there. Nor do the facts suggest that the defendant tried to hide his illegal activities from view of residents in the building or from passersby. See Commonwealth v. Pina, 406 Mass. 540, 546 (1990) (considering whether defendant took "normal precautions to implement any expectation of privacy he may have had in his wallet").
For these reasons, we affirm the denial of the defendant's motion to suppress.
2. Evidentiary rulings. The defendant argues that four evidentiary rulings unfairly curtailed his viable misidentification defense. We address each in turn.
First, the judge did not abuse his discretion in permitting Sergeant Toledo to offer testimony concerning whether the fence and shrubbery obstructed the view into the property as it existed on the date of Bruno's observations. The testimony was admitted in rebuttal to that of a defense witness who testified that a row of shrubbery existed along the fence line, thus suggesting that Bruno's view was obstructed. "Rebuttal is legitimate when it responds to the opponent's case; in this circumstance, ... the judge, as the controller of the trial, has a nearly unreversible discretion to allow it." Commonwealth v. Johnson, 41 Mass. App. Ct. 81, 89 (1996), quoting Commonwealth v. Guidry, 22 Mass. App. Ct. 907, 909 (1986). Moreover, we discern no abuse of discretion in permitting Toledo to testify in rebuttal even given the late disclosure of Toledo as a Commonwealth witness shortly before trial. See Commonwealth v. Trapp, 423 Mass. 356, 363-364 (1996), abrogated in part on other grounds, Commonwealth v. Sliech-Brodeur, 457 Mass. 300, 319 n.27 (2010) (judge has "significant discretion in deciding whether late-discovered or late-disclosed witnesses should be excluded from testifying"). The judge found that the Commonwealth's disclosure of Toledo, even if late, was made in response to the defendant's own late disclosure.
Second, we discern no error in the judge's decision to exclude photographs that did not purport to represent the fence on the day at issue. See Commonwealth v. Figueroa, 56 Mass. App. Ct. 641, 646 (2002) ("Photographs usually are authenticated directly through competent testimony that the scene they show is a fair and accurate representation of something the witness actually saw"). Although we accept that the photographs were fair and accurate representations of the scene on the day they were taken, the defendant did not establish that they were fair and accurate representations of the area on the date of the crime. On this basis, the judge could permissibly conclude that the photographs did not bear sufficient similarity to the scene on January 21, 2016, to be helpful to the jury. See Henderson v. D'Annolfo, 15 Mass. App. Ct. 413, 428-429 (1983).
Third, the judge did not err in excluding so-called third-party culprit information that did not point to any particular third party, but simply denied the defendant's participation. See Commonwealth v. Bright, 463 Mass. 421, 440 (2012) (third-party culprit evidence is "of minimal relevance [if] it [does] not point toward any particular third party who might have committed the crime"); Commonwealth v. Silva-Santiago, 453 Mass. 782, 800-801 (2009).
Finally, for the first time on appeal, the defendant, relying on Commonwealth v. Dew, 478 Mass. 304, 314-315 (2017), argues that Bruno should not have been allowed to identify the defendant in court because doing so "allowed the jury to gloss over the problems with his out-of-court identification; that is, the serious impediments to his view" of the defendant in the area behind 51-69 Orchard Street. However, as in Dew, we conclude the judge was entirely permitted to conclude that Bruno's out-of-court identification of the defendant on the day of arrest was unequivocal.
Judgments affirmed.

The defendant asserts that he has automatic standing. This argument fails with respect to Count 1 because it is a distribution offense, rather than a possessory one. See Commonwealth v. Negron, 85 Mass. App. Ct. 904, 905-906 (2014). We need not decide whether the defendant has automatic standing with respect to Count 2 (possession with intent to distribute heroin) given the judge's finding (based on Bruno's testimony) that the defendant had a possessory interest in the drugs under the carpet. See Commonwealth v. Williams, 453 Mass. 203, 208 (2009) (standing may be established where defendant has either "a possessory interest in the place searched or in the property seized or if [he] was present when the search occurred"). Given that finding, the defendant's standing did not disappear simply because he fled the scene, leaving the drugs behind. See Commonwealth v. Carnes, 81 Mass. App. Ct. 713, 715-716 (2012) (defendant had standing to contest search of backpack he abandoned in another's shed).